**VERIFICATION**

OCT 0 2 2009   ★

BROOKLYN OFFICE

COUNTRY OF _Republic of Italy_
~~Province of Milan~~
_City of Milan_
_Consulate General of the_
_United States of America_

CITY OF _____

) ) ) SS

ss. **09 4248**

**VITALIANO, J.**

_Davide Leinardi_, being duly sworn, deposes and says:

I am an officer authorized to sign on behalf of the Plaintiff in the above captioned action.

I have read the annexed VERIFIED COMPLAINT and know the contents thereof; the same is true to my own knowledge except as to those matters therein which are stated to be alleged on information and belief and as to those matters I believe it to be true.

AUTHORIZED OFFICER OF LD of Leinardi Davide

_LEINARDI DAVIDE_
Printed Name

_PRESIDENT L D . DI LEINARDI DAVIDE_
Title

Sworn to before me this

2 5 AUG 2009 day of _____, 2009.

Notary Public

**William R. Gill Jr.**
Consul of the
United States of America

**COMMISSION:**
**INDEFINITE**



Alexander Sediva (AS-6588)
MARZANO & SEDIVA
65 Broadway, 7th Floor, Suite #705
New York, NY 10006
(646) 225-6549
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

LD of Leinardi Davide, ALIDA VALLINI  and
DAVIDE LEINARDI

                       **Plaintiffs,**

    **-against-**

INTERNATIONAL MEDIA LLC, GUS-
TAVO SAGASTUME, JOHN BIFFAR,
DREAMTIME ENTERTAIMENT, INC.,
KOCH ENTERTAINMENT LP,  SANDRA
CARTER GLOBAL, INC., and FORREST
INCENTIVES LTD.

                       **Defendants.**

-------------------------------------------------------- x

CASE No._____

<u>**VERIFIED**</u>
<u>**COMPLAINT**</u>

<u>**DEMAND FOR JURY TRIAL**</u>

<u>**COMPLAINT FOR FOREIGN WORK COPYRIGHT INFRINGEMENT**</u>

Plaintiffs, by their attorneys, Marzano & Sediva, allege as follows:

### JURISDICTION AND VENUE

1.    This is a civil action seeking damages and injunctive relief for foreign work copyright infringement under the Berne Convention (17 U.S.C § 101 et seq).

2.    This Court has jurisdiction under 17 U.S.C. § 101 et seq,; 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338(a) (copyright).

3.     This Court has personal jurisdiction over all the Defendants, and venue is proper under 28 U.S.C § 1391(b) and/or 28 U.S.C § 1400(a), because two (2) of the Defendants reside in this District and acts of infringement complained of herein originated in this District.

**PARTIES**

4.     Plaintiff LD of Leinardi Davide ("LD") is a company duly organized and existing under the laws of Italy, with its principal place of business at Montopoli Val d'Arno , Italy.

5.     Plaintiffs Alida Vallini and Davide Leinardi are citizens of Italy and reside at Bolzano, Italy.

6.     Upon information and belief, defendant International Media LLC ("International Media") is a limited liability company duly organized and existing under the laws of the State of Florida with its principal place of business in the State of Florida.

7.     Upon information and belief, defendant Gustavo Sagastume ("Sagastume"), is an individual who resides at 1424 Lantana Drive, Fort Lauderdale, Florida.

8.     Upon information and belief, defendant John Biffar ("Biffar") is an individual who resides at Fort Meyers, Florida.

9.     Upon information and belief, defendant Dreamtime Entertainment, Inc. ("Dreamtime") is a corporation duly organized and existing under the laws of the State of Florida with its principal place of business in the State of Florida.

10.     Upon information and belief, defendant Koch Entertainment LP ("Koch") is a limited partnership duly organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

11.     Upon information and belief, defendant Sandra Carter Global, Inc. ("Sandra Carter") is a corporation duly organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

12.     Upon information and belief, defendant Forrest Incentives Ltd. ("Forrest") is a limited liability company duly organized and existing under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

## FACTUAL BACKGROUND

13.     Plaintiff "LD of Leinardi Davide" is a partnership formed by Ms. Alida Vallini and Mr. Davide Leinardi, which engages in the production of video-productions.

14.     Upon information and belief, defendant Koch Entertainment LP is a worldwide video-productions distributor.

15.     Upon information and belief, defendant Sandra Carter Global, Inc. is a worldwide video-productions distributor.

16.     Upon information and belief, defendant Forrest Incentives Ltd. is a worldwide video-productions distributor.

17.     Upon information and belief, defendant Gustavo Sagastume is the ex-President of PBS Florida and is the sole shareholder,  partner and President of International Media LLC.

18.     Upon information and belief, defendant Dreamtime Entertainment, Inc. is a world-wide video-productions distributor.

19.     Upon Information and belief, defendant John Biffar is a shareholder with decision making powers of Dreamtime Entertainment, Inc.

20.     On or about February 2, 2007, Alida Vallini and Davide Leinardi ("Vallini & Leinardi") entered into an agreement with Mr. Gustavo Sagastume (attached to this complaint as Exh. A) whereby each party was delegated a particular responsibility in the production, development and distribution of an original video-production entitled "Pope John Paul II: A Saint For Our Times" ("Pope John Production" or "the work").

21.     In the above-mentioned agreement, Vallini and Leinardi agreed to procure all contacts and materials for the production of the Pope John Production and Sagastume agreed to provide for the subsequent distribution contracts with the main distributors in the United States.

22.     Per the above-mentioned operating agreement, it was agreed among Vallini and Leinardi and Sagastume that the exclusive copyright of the Pope John Production, once acquired by Vallini and Leinardi, was supposed to be transferred to a limited liability company to be formed abroad.

23.     It was further agreed the equity interest in the new limited liability company would be divided with fifty percent (50%) of partnership equity to be owned by Vallini and Leinardi and fifty percent  (50%) of partnership equity to be owned by Sagastume, and, with an agreement signed on April 23, 2007  it was agreed that  Dreamtime Entertainment had the right to assign broadcast rights to PBS stations in the US, for a license period of  three years ( attached to this complaint as  Exh. B)

24.     Vallini & Leinardi formed the company named "LD of Leinardi Davide" ("LD") duly incorporated under the laws of Italy, in order to negotiate and to acquire the rights to  images and all video-materials from the Vatican Television Center, Centro Televisivo Vaticano ("CTV") for the video production .

25.     On September 20, 2007, per the terms of the above-mentioned agreement, plaintiff LD signed a contract, in conformity to the Italian laws, with CTV by virtue of which, LD acquired all the rights to the exploitation in any form, including the marketing, sale, distribution and broadcasting of all the audio and video-materials for a video-production entitled "Pope John Paul II: A Saint For Our Times" (attached to this complaint as Exh. C).

26.     Based on applicable Italian Law, plaintiff LD, being the exclusive assignee from the CTV , became the only entity  entitled to the lawful exploitation in any form of the images used for the future production.

27.     On November 24, 2007, LD, acting in accordance with the terms of the February 2, 2007 agreement with Sagastume, requested CTV to give its necessary consent, based on applicable Italian law, to the assignment of the exclusive copyright of the video-production from the plaintiff LD to ADG International LLC .

28.     ADG International LLC ("ADG") was the  Florida based limited company which should have been formed by Sagastume prior to the assignment from CTV.

29.     Per the terms of CTV's consent to assignment from LD to ADG, equity interest in ADG was supposed to have been divided equally between Sagastume and Vallini and Leinardi, whereby Sagastume would own fifty percent (50%) interest and Vallini and Leinardi would own fifty percent (50%) interest.

30.     At the time of the request for the consent to the assignment of the copyright from LD to ADG, ADG International LLC was intended to be the final and exclusive worldwide copyright owner of the video-production entitled  "John Paul II: A Saint For Our Times."

31.    On December 2, 2007, defendant Sagastume personally delivered to Vallini and Leinardi and to the CTV's Director Roberto Romolo in Vatican City, a signed "Limited Liability Company Operating Agreement of ADG International" (attached to this complaint as Exh. D).

32.    The "Limited Liability Company Operating Agreement of ADG International" was presented by Sagastume to LD and CTV as evidence of the alleged formation of the limited liability company which had been necessary to finalize the copyright transfer.

33.    On December 3, 2007, after the presentation and approval in Vatican City of the contents of the video-production, CTV gave its consent to the assignment of the copyright of the video-production from LD to ADG International LLC (attached to this complaint as Exh E).

34.    On or about the second week of January 2008, plaintiffs LD and Vallini and Leinardi discovered that ADG International LLC did not exist and was not registered in the U.S.

35.    On or about the end of January 2008, plaintiffs discovered that defendant Sagastume had only filed for registration of the company on January 28, 2008 (attached to this complaint as Exh F).

36.    On or about the beginning of February 2008, Vallini and Leinardi discovered that International Media LLC had, without their consent or knowledge, previously entered into separate distribution contracts with Koch Entertainment LP, Sandra Carter Global, Inc. and Forrest Incentives Ltd. for the sale and distribution of the Pope John Production ( attached to this complaint as Exh. G).

37.    On or about the beginning of February 2008, Vallini and Leinardi discovered that International Media LLC signed distribution contracts for the Pope John Production even before the acquisition of the copyright of the materials by LD from CTV.

38.     On or about the beginning of February 2008 Vallini and Leinardi also discovered that the contracts were signed by International Media LLC, acting as the "copyright owner" of the video-production.

**39.**     On or about the beginning of February 2008 Vallini and Leinardi discovered that the only partner of International Media LLC was Mr. Gustavo Sagastume who was marketing, selling, and distributing the video-production through his own personal company International Media LLC.

40. On or about the end of March 2008, Vallini and Leinardi discovered that copies of the video-production were distributed on the internet with the copyright to Dreamtime Entertainment, INC.

## QUALIFICATION OF THE VIDEO-PRODUCTION AS AN ITALIAN WORK

41. Plaintiffs   created an original work of authorship in the form of a original video-production fixed in a tangible medium of expression entitled "Pope John Paul II: A Saint For Our Times" ("the work").

42.     The video-production is qualified as a Berne Convention work as the video-production was first published in the United States without the copyright's owner consent and the authors and copyright owner of the work are Italian nationals.

43.     The video-production has been created entirely in Italy by Italian Nationals and falls into the prevision of the Berne Convention and subsequent international agreements signed by Italy and the United States of America.

## COPYRIGHTABILITY OF THE WORK

44.     The work has been created in its final version on December 3, 2007, in Italy.

45.     The work contains substantial amount of materials chosen and formed on the basis of plaintiffs' own expertise, labor, and judgment.

46.     The subject-matter work is copyrightable under the laws of the United States of America.

47.     Since September, 20 2007 plaintiff LD has been and still is the sole owner of all rights, title and interest in the copyright of the work.

48.     LD notified defendants that they infringed the copyrights' ownership, however defendants continue to infringe on the copyright.


## AS AND FOR THE FIRST CLAIM
### (Copyright Infringement)

49.     Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

50.     Defendants Sagastume,  International Media, Biffar and Dreamtime fraudulently and wilfully  misappropriated the copyright of the video-production.

51.     Defendants Sagastume and International Media fraudulently induced the contractual assignment of the copyright from CTV to ADG International LLC, a company which did not exist at the time of the assignment for the purpose of publishing the work in the United States by his owns means.

52.     Defendants Sagastume and International Media, as a consequence of the fraudulent inducement and misappropriation of the video production and without prior authorization, marketed,  sold, distributed and broadcasted the video-production "Pope John Paul II: A Saint

For Our Times" to defendants Koch , Sandra Carter and Forrest, despite the fact the copyright was exclusively owned by LD.

53.    Defendants Biffar and Dreamtime, without authorization from LD, are also illegally marketing, selling, distributing and broadcasting the video-production through multiple distribution channels and publishing the Pope John Production with  an illegal Dreamtime Entertainment Inc. copyright.

54.    The foregoing conduct by the above-mentioned defendants constitute copyright infringement.

55.    The foregoing acts of copyright infringement have been wilful, intentional and in disregard and indifference to the rights of plaintiff LD.

56.    Such conduct on the part of the defendants Sagastume, International Media, Biffar, Dreamtime, Koch, Sandra Carter and Forrest has caused and will continue to cause irreparable injury to plaintiffs, for which plaintiffs have no adequate remedy at law

57.    Such conduct on the part of defendants Sagastume, International Media, Biffar, Dreamtime, Koch, Sandra Carter and Forrest has caused and will continue to cause damages to plaintiffs in an amount to be determined.

58.    There is substantial likelihood that the plaintiffs will succeed on the merits of the action.


### AS AND FOR THE SECOND CLAIM
**(Breach of Contract)**

59.    Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

60.     Defendants Sagastume, International Media, Biffar and Dreamtime failed to fulfil their obligations and duties under the February 2, 2007  and April 23, 2007  agreements which constitutes a breach of contract.

61.     By reason of the foregoing breach of contract, defendants Sagastume, International Media, Biffar and Dreamtime are liable to plaintiffs for causing irreparable damages, lost profits and lost market opportunities.

62.     Such conduct on the part of the defendants Sagastume, International Media, Biffar and Dreamtime  has caused and will continue to cause irreparable injury to plaintiffs, for which plaintiffs have no adequate remedy at law.

63.     Such conduct on the part of defendants Sagastume, International Media, Biffar and Dreamtime has caused and will continue to cause damages to plaintiffs in an amount to be determined.


## AS AND FOR THE THIRD CLAIM
### (Breach of Fiduciary Duty)

64.     Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

65.     The foregoing conduct of Sagastume constituted a breach of fiduciary duty owed to the plaintiffs.

66.     Such conduct on the part of the defendant Sagastume has caused and will continue to cause irreparable injury to plaintiffs, for which plaintiffs have no adequate remedy at law

67.     Such conduct on the part of defendant Sagastume has caused and will continue to cause damages to plaintiffs in an amount to be determined.

### AS AND FOR THE FOURTH CLAIM
**(Unfair Competition and Unfair Trade Practices)**

68.     Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

69.     By reason of the foregoing, defendants  Sagastume, International Media, Biffar, Dreamtime, Koch, Sandra Carter and Forrest have engaged and continue to engage in acts of unfair competition and unfair trade practices.

70.     Such conduct on the part of the defendants Sagastume, International Media, Biffar, Dreamtime, Koch, Sandra Carter and Forrest has caused and will continue to cause irreparable injury to plaintiffs, for which plaintiffs have no adequate remedy at law

71.     Such conduct on the part of defendants Sagastume, International Media, Biffar and Dreamtime Koch, Sandra Carter and Forrest has caused and will continue to cause damages to plaintiffs in an amount to be determined.


**WHEREFORE,** Plaintiffs pray that it be granted judgment as follows:

i.     All Defendants, their agents and servants be enjoined during the pendency of this action  and permanently from infringing the aforementioned copyright of the plaintiff in any manner, and from publishing, distributing, selling, marketing or otherwise disposing of the video-production entitled "John Paul II: A Saint For Our Times"

ii.   All defendants be required to pay statutory damages and all the actual damages plaintiffs sustained in consequence of defendants' infringement copyright.

iii.   All defendants, in proportion of their own responsibility, be required to pay damages for infringement, wilful or not, unfair trade practices, unfair competition, breach of contract and breach of fiduciary duty, in a total amount not less than three million dollars ($3,000,000.00).

iv.   All defendants be required to account for:

   a.   all gains, profits, advantages derived by defendants' infringement of plaintiff's copyright;

   b.   all gains, profits and advantages derived by the defendants and through such unfair trade practices, breach of contract and breach of fiduciary duty; and

   c.   the court orders an accounting from the distributors for all the sales of the video-production named "Pope John Paul II: A Saint For Our times" done on behalf of International Media LLC, Gustavo Sagastume and Dreamtime Entertainment or any other company which may be the assignor of the named video-production, on any distribution channel including but not limited to the internet and accounting for the sales of every production which may have a different marketed name but with the same subject (Life of John Paul II) which has been negotiated among defendants or any entity in any way related to the defendants from October 2007 to-date;

v.   Defendants be required to deliver, during the pendency of the action all the copies of the Pope John Production in their possession for seizure and to deliver up for

destruction all infringing copies  and all plates, molds and other matter for making

such infringing copies.

vi.     The cumulative award of statutory damages and infringer's profits, according to

the degree of each defendant's position and responsibility.

vii.    Awarding the plaintiffs punitive damages.

viii.   The reimbursement of all the expenses sustained by the plaintiffs for the produc-

tion of the video-production and for hospitality expenses provided on behalf of

Sagastume, Biffar and their collaborators.

ix.     Awarding the plaintiffs costs and reasonable attorneys', expert witness, and inves-

tigating fees together with prejudgement interest.

x.      Awarding Plaintiffs such other and further relief as this Court may deem just and

proper.


**Dated: New York, New York**
**        July 26, 2009**



                                            **MARZANO & SEDIVA**
                                            *Attorneys for Plaintiffs*


                            **By:** _____
                                    Alexander Sediva (AS-6588)
                                    65 Broadway, 7th Floor, Suite #705
                                    New York, NY 10006
                                    (646) 225-6549

INDEFINITE

## VERIFICATION

COUNTRY OF _____   Republic of Italy
                     Province of Milan
                     City of Milan          } SS   )
                     Consulate General of the     )
CITY OF _____      United States of America     )        ss.:

ALIDA VALLINI  , being duly sworn, deposes and says:

I am the Plaintiff in the above captioned action.

I have read the annexed VERIFIED COMPLAINT and know the contents thereof;

the same is true to my own knowledge except as to those matters therein which are stated

to be alleged on information and belief and as to those matters I believe it to be true.

_____
ALIDA VALLINI

Sworn to before me this
**1 1 AUG 2009**
_____ day of _____, 2009.

_____
Notary Public

**William R. Gill Jr.**
**Consul of the**
**United States of America**

## COMMISSION:
## INDEFINITE

## VERIFICATION

COUNTRY OF _____
CITY OF _____

Republic of Italy
Province of Milan
~~City of Milan~~
Consulate General of the
United States of America

} SS

)
)
)
)

ss.:

DAVIDE LEINARDI, being duly sworn, deposes and says:

I am the Plaintiff in the above captioned action.

I have read the annexed VERIFIED COMPLAINT and know the contents thereof;
the same is true to my own knowledge except as to those matters therein which are stated
to be alleged on information and belief and as to those matters I believe it to be true.

_____
DAVIDE LEINARDI

Sworn to before me this

_____ day of **1 1 AUG 2009** , 2009.

_____
Notary Public

**William R. Gill Jr.**
Consul of the
United States of America

## COMMISSION:
## INDEFINITE

# Exhibit A

## LETTER OF INTENT

Entered into on ~~5. 8. 2007~~ by and between

Alida Vallini, resident in ~~BOLZANO~~ , IT. Fiscal Code no.

~~VLLDAGLHG6(PQ5Z~~ and  Davide  Loinardi,  resident  in

~~HOOTOROSIOSE D'ANPO~~ (together hereinafter referred to as the

Italian Partner) PISA IT

And  Weston, Florida

Gustavo Sagastume, resident in 1424 Lantana Dr., Fiscal code no.

U33-75-4474 (hereinafter referred to as th American Partner)

Witnesseth:

- - whereas the parties of the present agreement wants to realize a documentary about the life of Pope John Paul II/Karol Wojtyla, with particular attention to the sanctity of his life and the relevant canonization proceedings still pending at the Court of Rome (hereinafter referred to as the **Documentary**);

- - whereas such a documentary will be addressed to the public of all the world (hereinafter referred to as the **Territory**) by means of broadcasting service as well as DVD sale and distribution;

- - whereas the Italian Partner has got the necessary organization and knowledges to obtain from the Vatican State the necessary assistance, video and audio matherials (interviews with authoritative members of the clergy included) and licenses to make the Documentary as well as to obtain from Miss Katia Ricciarelli the soundtrack (or a part of the soundtrack) necessary for the making of the same Documentary;

- - whereas the American Partner has got the necessary organization and knowledge in order to obtain a contract for the broadcasting of

to be the beneficiary owner only of the relevant share.

USA as well as a distribution agreement of the DVD of the Documentary in the American territory (USA), as well as the organization and knowledges in order to produce and execute the Documentary and relevant DVD, being understood that the terms of such a production must be previously agreed by the parties and together with the clergy staff indicated by the Vatican authorities;

now therefore, it is agreed as follows.

## 1. Premises

The premises are an integral part of the present agreement.

## 2. Obbligations of the partners

2.1 The Italian Partner will have to keep all the necessary relationships and contacts with the competent Vatican authorities in order to obtain the video and audio matherials for the making of the Documentary as well as to obtain from Mis Katia Ricciarelli all the audio matherials for the soundtrack (or a part of the soundtrack) of the Documentary. Furthermore, the Italian Partner will have to make available the amount of EUROS 60.000,00 (say sixtythousand) for the company wich will be incorporated for the execution of the present agreement as set forth in the clause 3 herein after (hereinafter referred to as the **Company**). Such an amount may also be made available by means of execution of any agreement of sponsoring of the Documentary for equal amount. All the authorsations, licensees and consulations by the Vatican authorities will be obtained for the exclusive benefit of the Company. Such authorisations, licensees and consulation will have to be granted for a period of 10 (ten) years renewable.

2.2 The American Partner will have to obtain in favour of the Company the availability of the producer of the Documentary on the exclusive basis of the matherials submitted by the Italian Partner (the

2

soundrack will be the only party of the Documentary which may be increased with supplementary matherials to be agreed by the partners). Furthermore, the American Partner will have to obtain an agreement for the license of broadcasting of the Documentary to the American network PBS. Such a license will have to be paid by PBS EUROS 60.000,00 (say sixtythousand) at least and will have to be granted for a period of three year. The American Par ner will have to obtain a distribution agreement of the DVD in the USA territory with a first class distributor. The terms and conditions of the relevant distribution agreement will be previously discussed by the partners. The American partner qill also obtain an agreement for the production of one ore more DVD of the Documentary to be distributed and sold in the Territory. All the agreements and contracts referred to in the present clause 2.2 will be made for the exsclusive benefit of the Company.

2.3 No Compansation whatsoever may be claimed by the partners against the Company for the activities set forth in the present clause 2. In fact such activities will be performed by the partners as owners of the shares of the Company and for the benefit of the partnership hereto agreed.

## 3.  The Company

The partners agree that they will incorporate a company under the laws of Netherlands which will be the exclusive contractor of all the contracts and agreements to be obtained by the partners as per clause 2 hereinabove as well as of all the contracts and agreements to be entered into for a further distribution of the Documentary (by means of broadcasting or DVD distribution) in the Territory (the Company).

The capital stock of the Company will be held at the 50% by the two partners of the present agreement. Each partner partne may also decide

3

All the costs of incorporation of the Company will be borne by the partners in a share of the 50% each.

The Company will have to be incorporated within the 28th of February 2007 and the partners agree that the relevant shares (or the beneficiary ownership of the same) may not be assigned to any third party without the previous written consent of the other partner, as the Company is incorporated for the execution of the present agreement which is entered into on the exclusive basis of the personal qualities of the partners and their reciprocal trust.

Should the Company need any further financing (exceeding the payment of the license agreement to be paid by PBS as per clause 2.2 hereinabove and the EUROS 60.000,00 to be made available by the Italian Partner), the partners will provide for the necessary amounts at a rate of 50% each.

## 4. Miscellaneous provisions

The partners agree that the articles of the Company will have to provide for a unanimous decision on all the matters wich will involve substantial amendments to the provisions herein se forth.

All the obligations, engagements and rights of the partners as set forth in the present agreement are not assignable to any third party without the previous written authorisation of the other partner.

Agreed 2/8/2007

# Exhibit B

This is an agreement entered into by and between

Gustavo Sagastume, resident in Weston (FL), passport number 2058808 issued by te United States of America on the 06 February 2002, Alida Vallini, resident in Bolzano (Italy) fiscal code VLLLDA64M64A952W, Davide Leinardi, resident in Montoppli in Val D'Arno (Italy) fiscal code LNRDVD71M17B354N together acting on behalf of a company to be indicated I writing by the same and which will be he exclusive world wide rights' owner of the program hereto indicated (hereinafter referred to as the COMPANY)

and *4674*

Dreamtime Entertainment, with registered office in 1625 SE 48ᵗʰ St. Unit 4A, Cape Coral FL The United States of America, herein acting through Mr. John Biffar, duly empowered (hereinafter referred to as Dreamtime).

This is an agreement related to a special program on Pope John Paul II entitled "A Saint for Our Times" which will be produced by Dreamtime for PBS in the United States.

Dreamtime Entertainment acknowledges the COMPANY has world wide rights to the contents of the program to be exploited in any form as a DVD or as a broadcast or cable cast program, or in any digital form of distribution via the internet or other electronic means , in perpetuity. The COMPANY grants Dreamtime the right to assign broadcast rights to PBS for three years in the United States of America.

The COMPANY will provide DREAMTIME with research, access to interviews, U.S. rights to archival photographic and other recorded materials in addition to various expenses related to logistical needs of the project. The estimated value of these "in kind" services is estimated to be around $100,000 U.S.

The COMPANY will also provide DREAMTIME with an °author s royalty equal to 10% of net revenues from the COMPANY exploitation of the contents of this program throughout the world, in perpetuity.

DREAMTIME furthermore warrants that it will fulfill its responsibilities to PBS without encumbering THE COMPANY with any liability or added expenses.

THE COMPANY warrants that the footage and music it will provide for DREAMTIME's use will be cleared for U.S. use without any penalty or liability to DREAMTIME.

The program will have to be approved in writings by the COMPANY before broadcasting.

This agreement will be valid and legal according to the laws of Italy, The Netherlands and Florida.

DREAMTIME will own the copyright to the PBS program. THE COMPANY will own the copyright to the DVD and other versions of the program throughout the world in perpetuity.

THE COMPANY will own U.S. rights to the program once the PBS license period (of three years) is exhausted.

Signed in Rome (Italy) on this date  *23 APRILE 2007*        by

John Biffar
DREAMTIME ENTERTAINENT

Alida Vallini

Davide Leinardi

Gustavo Sagastume

**Exhibit C**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LD of Leinardi Davide, ALIDA VALLINI  and
DAVIDE LEINARDI

                    **Plaintiffs,**

        **-against-**

INTERNATIONAL MEDIA LLC,
GUSTAVO SAGASTUME,
JOHN BIFFAR,
DREAMTIME ENTERTAIMENT, INC.,
KOCH ENTERTAINMENT LP,
 SANDRA CARTER GLOBAL, INC.,
and FORREST INCENTIVES LTD.

                    **Defendants**

                                             **AFFIRMATION**

-----------------------------------------------------------------X

1.        I, **ELVIRA MARZANO,** an attorney duly admitted to practice law in the Courts of

the State of New York and in Italy,  being fluent in both Italian and English languages,

affirm that the annexed document entitled " Agreement for the acquisition of the rights on

the archive footage for the production of a video-tape about His Holiness Pope John Paul II"

is a true, correct and accurate translation in English language from the Italian language of

annexed document entitled "Accordo per l'acquisizione diritti su immagini d'archivio  per la

realizzazione di un video su S.S. Giovanni Paolo II"

DATED:        Salerno, Italy
              July 31, 2009

                                        _Elvira Marzano_
                                        _____
                                        Elvira Marzano Esq.

# CTV
**Vatican Television Center**

Messrs
**LD of Leinardi Davide**
**16, via della Democrazia**
**56020 Montopoli Val D'Arno**
**Pisa**

Re: **Agreement for the acquisition of the rights on the archive footage for the production of a video tape about His Holiness Pope John Paul II**

Further to the arrangement achieved,

**CTV Vatican Television Center** (henceforward CTV) represented by the Director-General Father Federico Lombardi, with its main offices in Via del Pellegrino, 00120 Vatican City

and

**LD di Leinardi Davide** (henceforward LD), in the person of the legal representative Mr. Davide Leinardi, with headquarters in via della Democrazia 16, 56020 Montopoli Val D'Arno (Pisa)

decide and confirm as follows:

Whereas:

    (a) LD required to CTV the licence to use footages taken from the CTV archives and in particular images concerning the pontificate of Pope John Paul II - 34 minutes full run – to be used for a production entitled *"Pope John Paul II – A Saint of Our Times"* (title in process);

    *(b)* LD is out to acquire the *"worldwide all media"* rights, not exclusive, for 10 years in relation to the minutes of the CTV archives referred to in section (a);

CTV and LD agree and decide as follows:

1. The preliminary remarks are essential requirements and integral and substantial part of the present agreement.

2. CTV will supply LD with one or more professional video tapes – Digital Betecam Pal or Betecam Sp Pal or Betecam NTSC – from its archives containing the archive material selected by the same LD; the filmed material will be supplied as it is.

3. CTV gives up to LD the non-exclusive rights, concerning the archive material selected, as specified in section (b). LD will be able to use the rights given up from the signing date of the present contract for a period of 10 years (License Period), only and exclusively in the production referred to in section (a); this license period is renewable for further 10 years, paying the fee referred to in section (10), sending a written communication by recorded delivery at least six months before the expiry of the ten-yearly deadline. LD will be able to use the archive material to produce trailers concerning the production referred to in section (a).

4. Any further and different use of the CTV archive material by LD will have to be pre-emptively arranged and authorized by the same CTV. CTV will be able to freely arrange its archives world-wide during the license period and the current agreement is to be regarded as express acceptance by LD of the transfer of the rights in a non-exclusive way.

5. LD will have to communicate to CTV, by fax or e-mail, any possible objection concerning the technical conditions of the archive material not later than 10 days after having withdrawn the material; if the technical inadequacy of the material is verified, CTV will restrict itself to replacing it for free.

6. Further to the use of the archive material, LD will deliver to CTV a video tape of the production in Digitalbetacam pal or DVD produced with archive material.

7. LD will be not able to give up to third parties the CTV archive material without CTV express authorization in writing.

8. LD expressly assures that the CTV archive footage will not be used for propagandistic, slanderous purpose or to damage the image, the dignity and the moral integrity of the Holy Father and the Holy See. Needless to say LD will vouch for the CTV towards every action brought by third parties concerning the improper use of the CTV archive footage.

9. The relationship disciplined by the present agreement does not establish any association constraint between the parties nor it can be considered as a 'join venture', collective firm or agency.

10. LD will pay to CTV, in recognition for the rights given up according to section (b) of the present agreement, the sum of € 20.000,00 (twenty thousand/00) after any tax applicable

which, if due, will be charged exclusively to LD. This amount will be paid in two stages: the first one equal to € 5.000,00 to be paid at the moment of the withdrawal of the material; the second one equal to € 15.000,00 to be paid not later than 7 days from the delivery of the material, by wire transfer on CTV checking account at the bank indicated by the same CTV at the moment of issuing the invoice.

11. Every communication concerning the present agreement will hold good only if it is sent to the addresses indicated there, except variations to be communicated in writing with adequate notice.

12. Every arrangement added or contrary to the content of the present agreement will be considered null and void if not drawn up in writing.

13. Every dispute rising on the formulation, interpretation, validity or effect of the present agreement or about its execution by the contracting parties which cannot be solved in good faith, in reciprocal collaboration, will be entrust to the exclusive jurisdiction of the Tribunal of the Vatican City. For the purpose of the present agreement, LD elects special domicile at the Registry of the Tribunal of the Vatican City.

Vatican City, September 20th, 2007

VATICAN TELEVISION CENTER

Rev. Federico Lombardi

- signature -

LD of Leinardi Davide

Davide Leinardi

- signature -

STAMP of the

VATICAN TELEVISION CENTER



**CTV**
CENTRO TELEVISIVO VATICANO

Spett.le

**LD di Leinardi Davide**
**Via della Democrazia, 16**
**56020 Montopoli Val D'Arno**
**(Pisa)**

**Oggetto: Accordo per l'acquisizione diritti su immagini d'archivio per la realizzazione di un Video su S.S. Papa Giovanni Paolo II**

A seguito delle intese intercorse, con il presente accordo tra

**CTV Centro Televisivo Vaticano** (di seguito CTV), rappresentato dal Direttore Generale P. Federico Lombardi, con sede in Via del Pellegrino 00120 Città del Vaticano

e

**LD di Leinardi Davide** (di seguito LD), nella persona del legale rappresentante Sig. Davide Leinardi, con sede in Via della Democrazia 16, 56020 Montopoli Val D'Arno (Pisa)

si stabilisce e si conferma quanto segue:

Premesso che:

(a)     LD ha richiesto al CTV la licenza ad utilizzare brani tratti dagli archivi dello stesso CTV, in particolare immagini relative al pontificato di Papa Giovanni Paolo II, per un totale di 34 minuti, da utilizzare all'interno di una produzione dal titolo *"Pope John Paul II – A Saint for our times"* (titolo di lavorazione);

(b)     LD intende acquisire, non in esclusiva, relativamente ai minuti di archivio CTV di cui al punto (a), i diritti *"worldwide all media"* per 10 anni;

tra CTV e LD si conviene e si stabilisce quanto segue:

1.  le premesse hanno valore di presupposto e di patto e formano parte integrante e sostanziale del presente accordo.

2.  Il CTV fornirà a LD relativamente al proprio archivio una o più videocassette professionali Digital Betacam Pal o Betacam Sp Pal o Betacam NTSC contenenti il materiale d'archivio selezionato dalla stessa LD; il materiale filmato verrà fornito nello stato in cui si trova.

**CTV**
CENTRO TELEVISIVO VATICANO

3. Il CTV cede a LD, relativamente al materiale d'archivio selezionato, i diritti non esclusivi così come specificato nel precedente punto (b). LD potrà utilizzare i diritti ceduti dalla data di sottoscrizione del presente accordo per un periodo di tempo di 10 anni (Periodo di Licenza) solo ed esclusivamente all'interno del programma di cui al punto (a); tale periodo di licenza sarà rinnovabile per ulteriori 10 anni dietro il pagamento del corrispettivo di cui al successivo punto 10. tramite comunicazione scritta da inviarsi da parte di LD con lettera raccomandata almeno sei mesi prima della scadenza del predetto termine decennale.

Resta inteso che LD potrà utilizzare il materiale d'archivio per la realizzazione di trailers relativi alla produzione di cui al punto a).

4. Qualunque ulteriore e diverso utilizzo del materiale di archivio CTV da parte di LD dovrà essere preventivamente concordato e autorizzato dallo stesso CTV. Resta inteso che il CTV potrà liberamente disporre del proprio archivio in tutto il mondo durante il Periodo di Licenza e varrà il presente accordo quale accettazione espressa da parte di LD della cessione dei diritti a titolo non esclusivo.

5. LD sarà tenuta a comunicare a CTV a mezzo fax o e-mail eventuali osservazioni concernenti le condizioni tecniche del materiale di archivio entro e non oltre 10 giorni dal ritiro del materiale stesso; qualora fosse riscontrata l'inadeguatezza tecnica del materiale il CTV si limiterà a sostituirlo a titolo gratuito.

6. A seguito dell'utilizzo del materiale di archivio, LD consegnerà al CTV una registrazione in Digitalbetacam pal o DVD della produzione nel quale è stato utilizzato il materiale di archivio.

7. LD non potrà cedere a terzi il materiale di archivio CTV, salva una espressa autorizzazione scritta da parte dello stesso CTV.

8. LD garantisce espressamente che il materiale di repertorio CTV non verrà utilizzato a fini parodistici, diffamatori o orientati in qualsivoglia altra forma a danneggiare l'immagine, la dignità e l'integrità morale della figura del Santo Padre e della Santa Sede. Resta inteso che LD manleverà il CTV nei confronti di qualsiasi azione da parte di terzi relativamente all'uso improprio del repertorio dello stesso CTV.

9. Il rapporto disciplinato dal presente accordo non crea alcun vincolo associativo tra le parti, né potrà essere interpretato come "joint venture", impresa collettiva o agenzia.

10. Quale corrispettivo per i diritti ceduti secondo il punto (b) del presente accordo, LD verserà a CTV la somma di *Euro 20.000,00* (ventimila./00) al netto di ogni ritenuta, imposta o tassa applicabile che, se dovuta, resterà a totale ed esclusivo carico di LD. Detto importo sarà corrisposto in 2 tranche: la prima pari a Euro 5.000,00 da corrispondersi al momento del ritiro del materiale; la seconda pari a Euro 15.000,00 da corrispondersi entro e non oltre 7 giorni dalla consegna del materiale tramite bonifico bancario sul c/c intestato al CTV presso l'istituto bancario indicato dallo stesso CTV all'atto dell'emissione della fattura .





**CTV**
CENTRO TELEVISIVO VATICANO

11. Ogni comunicazione relativa al presente accordo sarà ritenuta valida solo se effettuata presso gli indirizzi indicati nello stesso, salvo variazioni che dovranno essere comunicate per iscritto con congruo preavviso.

12. Qualsiasi patto aggiunto o contrario al contenuto del presente accordo sarà ritenuto nullo se non risulterà stipulato per atto scritto.

13. Ogni controversia che dovesse sorgere in ordine alla formulazione, interpretazione, validità o effetto del presente accordo o alla sua esecuzione da parte di una delle parti contraenti e che non potrà essere risolta secondo buona fede, in spirito di reciproca collaborazione, verrà affidata alla competenza esclusiva del Foro dello Stato della Città del Vaticano. Ai fini del presente accordo LD elegge domicilio speciale presso la Cancelleria del Tribunale dello Stato della Città del Vaticano.

Città del Vaticano, 20 settembre 2007

CENTRO TELEVISIVO VATICANO

P. Federico Lombardi

**C T V**
CENTRO TELEVISIVO VATICANO
00120 CITTA' DEL VATICANO

LD di Leinardi Davide

Davide Leinardi

# Exhibit D

**LIMITED LIABILITY COMPANY**
**OPERATING AGREEMENT†**
**·OF·**
**ADG INTERNATIONAL**
**2040 Sherman Street,**
**Hollywood, FL 33020**

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (the "Agreement") is entered into and shall be effective as of the 14th day of December, 2007, among **ADG International, LLC** (the "Company"), a limited liability company organized under the laws of the State of Florida (the "Charter State"), and the Members listed on Exhibit "A"
attached hereto (each referred to individually as a "Member" and collectively as the "Members").

**ARTICLE I**

**ORGANIZATION AND DEFINITIONS**

1.01    **Organization**.  The Company  was formed through the filing of the Charter with the Department of State of the Charter State.  The Company shall be governed by the laws of the Charter State in accordance with this Agreement.†

1.02    **Principal Office; Registered Office; Registered Agent**.  The principal and registered office of the Company shall be at such location as may be determined by the Board.  The registered agent of the Company will also be determined by the Board.  The initial principal office and initial registered office and registered agent shall be as set forth in the Charter, and shall remain unchanged until changed by the Board.

1.03    **Term**.  The Company was formed on the Filing Date, and will continue perpetually, unless it is sooner terminated under this Agreement.

1.04    **Certain Definitions and Agreements.**  As used in this Agreement, the following terms have the meanings ascribed to them in this Section 1.04 and include the plural as well as the singular number:

**"Additional Members"** shall mean those Persons who become Members after the Closing Date in accordance with this Agreement.

**"Affiliate"** means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person; (ii) any Person owning and controlling fifty percent (50%) or more of the outstanding voting interest of such Person; (iii) any officer, director, manager, member or partner of such Person; (iv) any Person who is an officer, director, manager, member, partner, trustee or holder of fifty percent (50%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence; or (v) an agent of such Person or of any Persons listed in the foregoing clauses (i) through (iv).

**"Agreement"** means this Operating Agreement, as amended from time to time.  Words such as "herein," "hereafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

**"Applicable Law"** means the laws of the Charter State relating to the governance and rights and obligations of limited liability companies and their members, managers and agents, including statutes and court decisions, and other laws which are binding on the Company and the Members and the Managers.

**"Approved Transfer"**  means any Transfer or series of Transfers approved by Consent of the Board.

**"Board"** means the Board of Managers of the Company.  The Board shall be comprised of all of the Managers of the Company as appointed pursuant to Article† VI hereof.

**"Book Depreciation"** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, and except as provided in Treasury Regulations Section 1.704-3, Book Depreciation shall be that amount which bears the same relationship to the Book Value of such asset at that time as the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes bears to its adjusted tax basis at such time.

**"Book Gain"** or **"Book Loss"** means gain or loss recognized by the Company for book purposes in any Fiscal Year or other period under the principles of Treasury Regulations Section 1.704-1(b)(2)(iv) by reason of a sale or other disposition of any Company asset. Book Gain or Book Loss shall be computed by reference to the Book Value of the asset as of the date of such sale or other disposition rather than by reference to the tax basis of the asset at such date. Every reference in this Agreement to "gain" or "loss" refers to Book Gain or Book Loss, rather than to tax gain or tax loss, unless the context manifestly otherwise requires.

**"Book Value"** of an asset means the gross Fair Market Value of an asset (other than cash), as determined by the Board in good faith, transferred as a Capital Contribution to the Company or, as of any particular date, the value at which the asset is reflected on the books of the Company as of such date. The Book Value of all Company assets shall be adjusted to equal their respective Fair Market Values, as determined by the Board, as of the following times: (i) the acquisition of additional Company Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property or money in exchange for all or a part of the Member's Company Interest; (iii) liquidation of a Member's Company Interest as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(g); (iv) at such other time as may otherwise be required by this Agreement; or (iv) at any other time required by Treasury Regulations Section 1.704-1(b)(2)(iv), 1.704-2 or 1.704-3. The Book Value of any Company asset distributed to any Member shall be adjusted to its Fair Market Value as determined on the date of distribution.

**"Capital Account"** means the Capital Account established for each Member and maintained in accordance with the provisions of this Agreement and the Treasury Regulations.

**"Capital Contribution"** means the total amount of cash or Fair Market Value of other property contributed to the equity of the Company by each Member pursuant to this Agreement, which shall be equal to the amount stipulated in writing by said Member and the Company, as determined by the Board. Any reference in this Agreement to the Capital Contribution of either a Member or any assignee of a Member includes any Capital Contribution previously made by any prior Member to whose Company Interest the then existing Member or assignee succeeded. The amounts of the initial Capital Contributions of the Members are set forth in Schedule†"A" hereto.

**"Charter"** means the articles or certificate of organization or formation, as the case may be, or other document filed with the Department of State or other government agency of the Charter State for the purpose of evidencing the organization of the Company pursuant to the laws of the Charter State.†

**"Charter State"** means the State, Commonwealth or other jurisdiction identified as the Charter Sate in the first paragraph of this Agreement.

**"Claims"** has the meaning set forth in Section†7.02.

**"Closing Date"** means the date of the execution of this Agreement.

**"Code"** means the Internal Revenue Code of 1986, as it may be amended, or any subsequent federal law concerning income tax as enacted in substitution for, or that corresponds with, such Code.

**"Company"** means the limited liability company identified as the "Company" in the first paragraph of this Agreement.

**"Company Interest(s)"** includes only a Member's Capital Account and the right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Company, all in accordance with the terms of this Agreement and excludes Company Rights.

**"Company Right(s)"** means the voting and consent rights of a Member provided in this Agreement and Applicable Law.

**"Consent"** means the consent of the Members or Managers, as applicable, which shall be effected by the Majority Vote of the Members or Managers to the doing of the act or thing for which the Consent is solicited at any meeting called and held in accordance with the terms of this Agreement to consider the doing of such act or thing, or by a written Consent given by the consenting Members or Managers, as applicable, at or prior to the doing of the act or thing for which the Consent is solicited. A written Consent of the Members or Managers shall be sufficient if signed pursuant to a Majority Vote of the Members or Managers, as applicable.

**"Control"** means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or

otherwise. The term "controls," "controlled by" and "under common control with" have correlative meanings, irrespective of capitalization.

"**Covered Person**" has the meaning set forth in Section†7.02.

"**Fair Market Value**" means, with respect to any item, the price (in cash or other consideration) at which said item would be sold in a sales transaction between a willing buyer and a willing seller negotiating on arms'-length terms. The Fair Market Value of an item shall be deemed for all purposes to be equal to the Fair Market Value of such item as determined by the Board and specified in writing pursuant to a duly adopted resolution of the Board, so long as such determination is reasonable and made in good faith by the Board.†

"**Family Member**" of an individual means the spouse, lineal descendants (whether adopted or natural), parents, grandparents, siblings, aunts, uncles, nieces, nephews, cousins and the spouses of any of them and any family limited partnership or trust or other fiduciary relationship established solely for the benefit of such individual and/or such individual's spouse, lineal descendants, parents, grandparents, siblings, aunts, uncles, nieces, nephews, cousins and the spouses of any of them.



"**Filing Date**" means the date on which the Charter was filed with the Department of State or other governmental agency of the Charter State.

"**Fiscal Year**" means the period beginning on January†1 and ending on December†31 or any other fiscal period selected by the Board for financial reporting and tax purposes.†

"**Majority Vote**" means the affirmative vote of Members holding as of a particular date a majority of the outstanding Units entitled to vote with respect to such matter or the affirmative vote of a majority of the Managers, as applicable.



"**Managers**" means those Persons appointed as Managers from time to time by the Members in accordance with Article VI hereof.

"**Members**" means the Persons designated in this Agreement as the members of the Company and any Persons who become members of the Company, pursuant to this Agreement, in the Persons' capacity as members of the Company.

"**Notification**" means a writing, containing the information required by this Agreement to be communicated to any Person.

"**Percentage Interest**" means, with respect to a Member, the quotient of the number of Units held by such Member, divided by the total number of Units held by all of the Members.

"**Permitted Transfer**" shall mean a Transfer of Units by a Member (a) upon the death of a Member by intestate succession, will or similar document executed by the Member, or while such Member is living, to a Family Member of such Member or (b) to an Affiliate of such Member.

"**Person**" means a natural person, corporation, trust, partnership, joint venture, association, limited liability company or other business or other legal entity of any kind.

"**Profit**" or "**Loss**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments: (i) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv) shall be subtracted from such taxable income or loss; (iii) in lieu of the depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such Fiscal Year; (iv) Book Gain or Book Loss shall be taken into account in lieu of any tax gain or tax loss recognized by the Company; and (v) items of income, gain, loss, or deduction allocated separately pursuant to Section 4.04 hereof shall be excluded from the computation of taxable income or loss. If the Company's taxable income or loss for such Fiscal Year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profit for such Fiscal Year, and if negative, such amount shall be the Company's Loss for such Fiscal Year.

"**Project**" means the Property as the same is developed and improved by the Company.

**"Property"** the parcel of land located at _____, _____, as more particularly described in Exhibit A hereto, together with all improvements located thereon, and all rights, permits and licenses relating thereto.

**"Pro Rata"** means in the proportion that the item being measured for each Member bears to the total of all such items for all Members for whom a contribution, distribution, or allocation is due or being made, shared, or determined.

**"Tax Matters Member"** means Gustavo Sagastume such perso

n as may be designated by Majority Vote of the Members.

**"Transfer"** means, as a noun, any direct or indirect, voluntary or involuntary, exchange, sale, bequeath, pledge, mortgage, hypothecation, encumbrance, distribution, transfer, gift, assignment or other disposition or attempted disposition of, and, as a verb, directly or indirectly, voluntarily or involuntarily, to exchange, sell, bequeath, pledge, mortgage, hypothecate, encumber, distribute, transfer, give, assign or in any other manner whatsoever dispose or attempt to dispose of.

**"Treasury Regulations"** and **"Regulations"** means the regulations of the United States Treasury Department pertaining to the Code, as amended, and any successor provision thereto.†

**"Units"** means units of the Company issued to each Member hereunder, which represent each Member's Company Interest and Company Rights in the Company. Units shall not be evidenced by certificates and their ownership is evidenced solely by this Agreement and by the records of the Company. The number of Units issued to each Member is set forth in Exhibit†"A" hereto.

## ARTICLE II

### PURPOSES AND BUSINESS OF THE COMPANY; RIGHTS OF THE COMPANY

2.01  **Purposes of the Company**. The Company has been formed for the purpose of carrying on any lawful purpose permitted to be carried on by limited liability companies under Applicable Law.

2.02  **Authority of the Company**. To carry out its purposes, the Company, consistent with and subject to the provisions of this Agreement and all applicable laws, is empowered and authorized to do any and all acts and things incidental to, or necessary, appropriate, proper, advisable, or convenient for, the furtherance and accomplishment of its purposes.

2.03  **Special Limitations**. Notwithstanding the authority of the Company set forth in Section 2.02 or any other provision of this Agreement, the Company shall not:

(a)  fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation; or

(b)  fail to file its own tax returns; or

(c)  fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or Person or to conduct its business solely in its own name in order not to mislead others as to the identity with which such other party is transacting business; or

(d)  elect under Treasury Regulations Section 301.7701-3 to be taxed as an association taxable as a corporation.

## ARTICLE III

### MEMBERS; CAPITAL CONTRIBUTIONS;† CAPITAL ACCOUNTS; UNITS

3.01  **Members.** The name, address, and Capital Contribution of each Member, and number of Units issued to each Member, are set forth in Exhibit†"A" hereto, amended from time to time to reflect the admission of

Additional Members. [Except as otherwise provided in this Agreement, the Members shall not be required to lend any funds to the Company or to make any additional Capital Contribution to the Company.]

3.02   **Additional Members**. Additional Members may be admitted to the Company only with the Consent of the Board. This Agreement shall be amended to reflect the Additional Members as parties, and Exhibit "A" shall be amended to set forth the information relating to said Additional Members, including the amount of their capital contributions and number of Units issued to the Additional Members. The Members acknowledge and agree that the admission of Additional Members will reduce their proportionate rights with respect to the Company, including without limitation their Percentage Interests, and hereby Consent to the admission of Additional Members and to such reductions. The Additional Members shall be required to execute this Agreement, as so amended.

3.03.   **Company Capital; Representations and Warranties Regarding Contributions**.



(a)   The Members have made initial Capital Contributions in amounts reflected opposite each Member's name in Exhibit "A" hereto (or shall make them within 5 days after the Closing Date) and such amounts shall be credited to each Member's Capital Account.

(b)   No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account.

(c)   A Member shall not receive from the Company or out of Company property and shall have no right to withdraw and demand, and the Company shall not return to a Member, any part of its Capital Contribution or Capital Account. Distributions to the Members shall be made only as expressly provided for in this Agreement.



(d)   The Company may from time to time determine that additional capital (in addition to the Capital Contributions made pursuant to this Agreement) is required in order to achieve the purposes of the Company described above. Upon Majority Vote of the Board, the Board is authorized to cause the Company to offer additional Units in the Company to investors upon such terms and conditions as are determined by the Board to be fair and reasonable. In addition, the Board may cause the Company to issue additional Units in the Company or options and/or warrants to acquire such additional Units to Persons providing services to the Company (including employees or other agents of such Persons) or other Persons on such terms as the Board may determine. The Board is authorized to cause the Company to take all necessary actions, including the amendment of this Agreement, to reflect the admission of Additional Members and the adjustment of the number of Units held by the Members, resulting from the offering of additional Units in the Company. No Person shall have any preemptive or similar rights regarding the issuance of additional Units merely by reason of the Person's status as a Member.

3.04   **Capital Accounts**.

(a)   A separate Capital Account shall be maintained for each Member in accordance with the following provisions:

(i)   To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits, and any items thereof that are specially allocated pursuant to Article†IV, and the amount of any Company liabilities that are assumed by such Member or that are secured by, or subject to, any Company property distributed to such Member.

(ii)   To each Member's Capital Account there shall be debited the amount of cash and the Fair Market Value of any Company property distributed to such Member pursuant to any provisions of this Agreement, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Article†IV, and the amount of any liabilities of such Member that are assumed by the Company or that are secured by, or subject to, any property contributed by such Member to the Company.

(b)   Except as provided to the contrary in this Agreement, the foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Company may make such modification. The amounts debited or credited to Capital Accounts with respect to (i) any property contributed to a Member or distributed to a Member, and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company or a Member shall be adjusted in the event the Company determines that such adjustments are necessary or appropriate pursuant to Treasury

Regulations Section 1.704-l(b)(2)(iv). The Board may also cause Capital Accounts to be revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) including, but not limited to, upon the admission of Additional Members to the Company, if such a revaluation is necessary to reflect the economic arrangement of all Members. The Board may also make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-l(b).

(c)     In the event of a Transfer of Units in accordance with this Agreement, the Capital Account balance and other rights attributable to such Units shall be transferred to the assignee. For purposes of determining the Capital Account balance of a Member attributable to a Unit and distributions to be made to a Member with respect to a Unit, (i) the Capital Account balances of the Members set forth on Exhibit "A" hereto, adjustments to such Capital Accounts relating to the allocation of Profits or Losses, distributions and other items, and other attributes of a Member's Company Interest, shall be apportioned and allocated in equal amounts among all Units held by a Member to which said balances, adjustments or attributes relate, and (ii) Capital Contributions made by a Member after the date hereof shall be allocated and apportioned in equal amounts among all Units held by the contributing Member, except as may otherwise be specified in writing by said Member and agreed to by Consent of the Board.



3.05    **Liability of Members**.

(a)     Subject to Section 3.05(b), no Member shall have any personal liability whatsoever in his capacity as a Member, whether to the Company, to any of the Members, or to the creditors of the Company, for the debts, liabilities, contracts, or any other obligations of the Company, or for any losses of the Company. †A Member shall be liable only to make its initial Capital Contributions as expressly provided for herein and shall not be required to lend any funds to the Company or to make any further capital contributions to the Company or to repay to the Company, any Member, or any creditor of the Company all or any fraction of any negative amount in a Member's Capital Account.



(b)     In accordance with Applicable Law, a Member of the Company may, under certain circumstances, be required to return to the Company, for the benefit of Company creditors, amounts previously distributed to such Member. It is the intent of the parties that no distribution to any Member shall be deemed a return or withdrawal of capital, and that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member only and not of any other Member.

(c)     A Member shall not be personally liable for the payment or repayment of any amounts standing in the account of another Member including, but not limited to, the Capital Contributions. Any such payment or repayment, if required to be made, shall be made solely from the Company's assets.

(d)     A Member shall have no personal liability to repay to the Company any portion or all of any negative amount of the Member's Capital Account.

3.06    **Transaction Expenses**. The Company shall pay and assume any pre-formation expenses of the Company and the direct expenses of the Members, or Affiliates thereof, in connection with the consummation of the transactions contemplated in this Agreement provided, however, that each Member shall pay and assume its own expenses in connection with the negotiation of this Agreement.

# ARTICLE IV

# ALLOCATIONS

4.01    **Determination of Profits and Losses**. Profits and Losses of the Company shall be determined for each Fiscal Year of the Company in accordance with the method of income tax accounting adopted by the Board for the Company consistently applied and shall be allocated among the Members in the manner provided in this Article IV.

4.02    **Allocations**. The net amount of Profits or Losses for any Fiscal Year shall be allocated among the Members in such manner that, as of the end of such Fiscal Year, the sum of (a) the Capital Account of each Member, (b) such Member's share of "partnership minimum gain" (as determined according to Regulations Section 1.704-2(g)) and (c) such Member's "partner nonrecourse debt minimum gain" (as determined according to Regulations Section 1.704-2(i)(3)) shall be equal to the respective net amount, positive or negative, which would be distributed to such Member or for which such Member would be liable to the Company under this Agreement, determined as if the Partnership were to (i) sell the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of liquidation pursuant to Section 9.02. The allocations under this Section 4.02

shall be of the residual amounts of Profits and Losses after giving effect to the special allocations of Section 4.04.

### 4.03 Tax Allocations.

(a)     Except as otherwise provided in this Agreement, for Federal income tax purposes, all items of Company income, gain, loss, deduction, basis, amount realized and credit, and the character and source of such items, shall be allocated among the Members in the same manner as the corresponding items of income, gain, loss, deduction or credit are allocated to Capital Accounts in accordance with Sections†4.02 or 4.04. The Company shall maintain such books, records and accounts as are necessary to make such allocations.

(b)     The Board is authorized to make, for tax purposes only, allocations of income, gain, loss or deduction or adopt conventions as are necessary or appropriate to comply with the relevant Treasury Regulations or Internal Revenue Service pronouncements under Section†704(c) of the Code, and in particular, in respect of a Capital Contribution of property other than cash and adjustments to the Book Value of Company assets at the times specified in the definition of Book Value. Allocations will be made under methods selected by the Board and in a manner consistent with Treasury Regulations Section 1.704-3 and in conformity with Treasury Regulations Section 1.704-l(b)(2)(iv)(f) and 1.704-l(b)(4)(i).

### 4.04 Special Allocations.

(a)     Nonrecourse deductions within the meaning of Regulations Section 1.704-2(b)(1) shall be allocated to the Members Pro Rata in accordance with their Percentage Interests.

(b)     Partner nonrecourse deductions within the meaning of Regulations Section 1.704-2(i) shall be allocated to the Member who bears the economic risk of loss with respect to the particular partner nonrecourse liabilities to which they relate in accordance with said Regulations.

(c)     Items of income and gains shall be allocated to the Members in such manner as shall cause the Company to make allocations in accordance with (i) the provisions relating to a "qualified income offset" under Regulations Section 1.704-1(b)(2)(ii)(d) and related provisions, and (ii) the provisions relating to "minimum gain chargebacks" under Regulations Sections 1.704-2(f) and 1.704-2(i)(4) and related provisions.

(d)     The allocations under this Section 4.04 shall be made prior to the allocations under Section 4.02

### 4.05 Allocations in Event of Transfer; Prorations.

(a)     Subject in all cases to applicable law, if there is a Transfer of all or any part of a Member's Company Interest in accordance with this Agreement, for purposes of allocations of Profits and Losses and distributions of cash and property, (i) the effective date of the Transfer as to the Company will be the effective date stated in the Transfer instrument or such other date as the assignor and assignee agree, but not earlier than the date the Board receives Notification of the Transfer, or, in the case of an involuntary Transfer, the date of the operative event. Distributions of cash and property with respect to any Units shall be made to the Person who is shown as the holder of such Units in the Company's books at the time of the distribution.

(b)     In the event of a change in a Member's Percentage Interest during the course of a Fiscal Year or other allocation period as the result of the admission of a new Member, a Transfer of Units by a Member in accordance with this Agreement or any other event, allocations to said Member of Profits, Losses and other items arising during such period shall be determined in accordance with the weighted average Percentage Interest of the Member during said period, giving equal weight to each day during such period, except that if the Treasury Regulations require another method for making such allocations in such case, or if the Board approves another method for making such allocations which is reasonable and complies with the Treasury Regulations then the allocations to such Member shall be made in accordance with such other method.

### 4.06 Imputed Interest. If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483, or 1271 through 1288 or corresponding provisions of subsequent Federal income tax law, then any item of income or expense of the Company attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, and a corresponding Capital Contribution by or distribution to said Member shall be deemed to have occurred, as appropriate.

**ARTICLE V**

## DISTRIBUTIONS

5.01   **Timing and Priority of Distributions**.  Except as otherwise provided in this Agreement, the Company shall distribute cash or other property to the Members at such times as may be determined by the Board, and all such distributions shall be made to the Members Pro Rata in accordance with their relative Percentage Interests.

5.02   **Distributions In Kind**.  If the Company distributes property other than cash to its Members, the amount of such distribution shall be deemed to be equal to the Fair Market Value of the property distributed, net of any liabilities that said property may be subject to or which may be assumed by the Members in connection therewith.  Said Fair Market Value shall be determined by the Board in good faith.

5.03   **Payments to Tax Authorities**.  Notwithstanding anything to the contrary in this Agreement, the Company shall withhold such amounts as may be required pursuant to the Code (including Section 1446 thereof), Treasury Regulations or any provision of any state, local or foreign law with respect to any payment, distribution or allocation of income to the Members and such withheld amounts shall be treated for all purposes of this Agreement as amounts distributed pursuant to Article V or Article IX to the Members to which such withholdings are attributable and distributions to be made to such Members shall be reduced by the amount so withheld.  The Company shall pay over to any federal, state, local or foreign government any amounts required to be so withheld in accordance with applicable law.

5.04   **Limitation on Distributions to Members**.  The Company shall not distribute cash or property to any Member unless, after such distribution is made, the fair value of the Company's assets exceeds its liabilities, and unless said distribution is in compliance with any loan agreements or similar documents to which the Company is subject.

## ARTICLE VI

## MANAGEMENT; BOARD OF MANAGERS;
## MEETINGS AND CONSENTS OF THE BOARD AND MEMBERS;

6.01   **Management Power of Board**.  The Board is hereby granted the right, power, and authority to do on behalf of the Company all things which are necessary or appropriate to manage the Company's affairs and fulfill the purposes of the Company, including delegating their management powers to officers, employees, agents or other representatives of the Company. Except as expressly provided for in this Agreement, no actions of the Company require the Consent of any Members, and all Company actions that are authorized by the Board will be deemed to be valid in all respects.  Actions authorized by the Board that do not require the Consent of the Members include without limitation the disposition of all or substantially all of the assets of the Company, the borrowing of money, the merger of the Company with any other entity and the entering into transactions with Affiliates or other related persons of the Company or any Member on arms-length terms, as determined by the Board. Any and all persons dealing with the Company shall have the right to rely upon the actions of the Board to bind the Company by its actions or signature.   Only the Board has the authority to act for, and bind, the Company.

6.02   **Authority of the Members**.  No Member shall take part in the management or control of the Company's business or affairs.  Members shall have power to represent, act for, sign for or bind the Company on behalf of others provided the other members approve in writing to the specific item or contract. The Members hereby Consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

6.03   **Number of Managers; Qualifications**  The number of Managers on the Board shall be determined by Consent of the Members.  Managers need not be Members.

6.04   **Appointment of Managers; Removal; Vacancies**. Managers shall be appointed, removed and replaced pursuant to a Consent of the Members. A Manager may be removed from such office and replaced at any time and for any reason.  Vacancies on the Board shall be filled pursuant to a Consent of the Members.  A Manager shall continue to serve in such office until removed or until said Manager dies or resigns.

6.05   **Board Meetings**.  Regular meetings of the Board may be held at such places within or without the Charter State and at such times as the Board may from time to time determine, and if so determined, Notification thereof need not be given.  Special meetings of the Board may be held at any time or place within or without the Charter State whenever called by any Manager.  Notification of a special meeting of the Board shall be given by the person or persons calling the meeting at least twenty-four (24) hours before the special meeting.  Said Notification must specify the time and place, and information regarding telephone numbers.  Notification must be sent to the addresses and fax numbers specified in the records of the Company with respect to each Manager.

Members of the Board may participate in a meeting thereof by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.†

6.06    **Vote Required for Action**.  A Consent shall be required and shall be sufficient for any action taken by the Board.

6.07    **Executive Officers; Election; Qualifications; Term of Office; Resignation; Removal; Vacancies**.  The Board may elect a President, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Treasurer, one or more Assistant Treasurers, and such other officers as the Board deems necessary. Each such officer shall hold office until the first annual meeting of the Board after the Officer's election, or until the Officer's successor is elected and qualified or until the Officer's earlier resignation or removal. Any officer may resign at any time upon Notification to the Company.  The Board may remove any officer with or without cause at any time. Any number of offices may be held by the same person. Any vacancy occurring in any office of the Company by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board at any regular or special meeting.† ·

6.08    **Powers and Duties of Executive Officers**.  The officers of the Company shall have such powers and duties in the management of the Company as may be prescribed by the Board.

6.09    **Meetings of Members**.  Any matter requiring the Consent of all or any of the Members pursuant to this Agreement may be considered at a meeting of the Members held not less than five (5) business days after Notification thereof shall have been given to all other Members by (i) Members with Company Rights and owning at least 10 percent of the Units, or (ii) any Manager. The Notification shall state the proposed action to be taken. The Company shall not be required to hold a special or annual meeting of Members.  A Member may issue a proxy or power of attorney to any Person to act on its behalf at any meeting, and the actions of such Person consistently with such proxy or power of attorney shall be deemed to be the actions of said Member.

6.10    **Submissions to Members**.  The Board shall give all the Members Notification of any proposal or other matter required by any provision of this Agreement or by law to be submitted for the consideration and approval of the Members. Such Notification shall include any information required by the relevant provision of this Agreement or by law.

**ARTICLE VII**

**REIMBURSEMENT AND INDEMNITY**

7.01    **Reimbursement of Managers.**

(a)    Managers shall be entitled to be reimbursed by the Company for out-of-pocket expenses incurred in their capacities as Managers in connection with the management of the Company and its business.†

(b)    Managers shall receive compensation for any activities involving the affairs or the management of the Company only as provided for in written agreements with the Company.

7.02    **Indemnification of the Managers and Members by the Company.**

(a)    The Company shall indemnify and hold harmless the Members, the Managers and the Company's officers and employees, and the Affiliates of each of the foregoing Persons (each of the foregoing Persons is referred to as a "Covered Person"), to the fullest extent permitted by law against losses, judgments, liabilities, expenses and amounts incurred or paid, including attorneys' fees, costs, judgments, amounts paid in settlement, fines, penalties and other liabilities, by the Covered Person in connection with any claim, action, suit or proceeding (collectively, "Claims") in which such Covered Person becomes involved as a party or otherwise, or with which such Covered Person shall be threatened, in connection with the conduct of the Company's affairs. Expenses incurred by any Covered Person in connection with the preparation and presentation of a defense or response to any Claims covered hereby shall be paid by the Company.  The Company shall pay the amounts described herein to the Covered Person (or to the parties making Claims against the Covered Person in satisfaction of their Claims) within 10 days after written demand therefor is delivered to the Company by the Covered Person.†

(b)    Without limiting the foregoing paragraph (a), the indemnities by the Company provided for therein shall apply with respect to all actions taken by the Managers or Members which they believe to be in the best interest of the Company in accordance with the business judgment rule, other than actions which constitute willful misconduct or gross negligence.

**ARTICLE VIII**

### TRANSFEREES

8.01   **Prohibition Against Transfers**.  Except for (i) Approved Transfers, (ii) Permitted Transfers, and (iii) as otherwise expressly permitted by this Article VIII, no Transfer of any Units, or any interest in any of such Units may be made by a Member to any Person, whether voluntarily or by operation of law.  Any Transfer which violates the terms of this Section 8.01 and which does not fully comply with the terms of this Agreement, shall be void and ineffective, and the Company shall not transfer any Units on its books in violation hereof.  A copy of this Agreement shall be kept at the principal place of business of the Company.  As a condition precedent to any Transfer of any Units or any interest in any of such Units, the transferee shall be required to execute a counterpart of this Agreement and agree to be bound by the terms hereof as if the transferee were an original Member.  Each transferee shall hold such Units or interests in such Units subject to all of the provisions of this Agreement and shall make no further Transfers except as provided in this Agreement.  The failure or refusal of a transferee to execute and deliver to the Company such a counterpart or agreement shall not limit the applicability of this Agreement to the Units transferred.  The transferor and transferee of Units hereby indemnify the Company for any loss or damages it may incur as a result of its recognition or nonrecognition of a transfer or Units.  Notwithstanding anything to the contrary set forth herein, any sale of any equity interest in the Company to a competitor of the Company shall in any event require the prior Consent of the Board.

### ARTICLE IX

### DISSOLUTION; LIQUIDATION AND TERMINATION OF THE COMPANY

9.01   **Dissolution**.

(a)     The Company shall be dissolved upon the happening of any of the  following events (i) the Consent of the Board to dissolve the Company following the sale, distribution to the Members, or other disposition of all or substantially all of the assets of the Company; or (ii) as required by Applicable Law.†

(b)     Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Charter of the Company has been canceled and the business of the Company wound-up and assets of the Company distributed as provided in Section 9.02.

9.02   **Liquidation**.

(a)     Upon dissolution of the Company, the Board or a liquidating trustee, if one is appointed, shall wind up the affairs of the Company and liquidate all or any part of the assets of the Company.  The Board or such liquidating trustee shall determine the time, manner and terms of any sale or other disposition of the Company's property for the purpose of obtaining, in its opinion, fair value for such assets.

(b)     Profits and Losses arising from such sales and distributions upon liquidation shall be allocated to the Member's Capital Accounts as provided in Article IV prior to making liquidating distributions to the Members. In settling accounts after dissolution, the assets of the Company shall first be paid out to creditors, whether by payment or by establishment of due and adequate reserves, in the order of priority as provided by law; and then to the Members, Pro Rata in accordance with their relative Percentage Interests.

(c)     When the Board or liquidating trustee has complied with the foregoing liquidation plan, the Members shall execute, acknowledge, and cause to be filed an instrument evidencing the cancellation of the Articles of the Company.

### ARTICLE X

### AMENDMENTS

10.01  **Amendments Generally**.

(a)     Amendments to this Agreement to reflect the addition or substitution of a Member, the admission of a successor Member by the Company or the withdrawal of a Member, shall be made at the time and in the manner referred to in Article VIII.

(b)     The Board shall, within a reasonable time after the adoption of any amendment to this Agreement, make any filings or publications required or desirable to reflect such amendment, including any required filing for recordation of any certificate of the Company or other instrument or similar document of the type

contemplated by this Agreement.†

10.02   **Adoption of Amendments.**

(a)   Except as otherwise provided in Section 10.02(b), this Agreement may be amended from time-to-time only pursuant to a Consent of the Members.

(b)   Notwithstanding any other provision of this Agreement to the contrary, the Board has the authority to amend this Agreement without the Consent of any Member if the amendment either is necessary or advisable to reflect the economic arrangement of the Members or does not have a material adverse economic effect on any Members. Each Member by executing this Agreement acknowledges and agrees that amendments to this Agreement approved by a Majority Vote of Members are valid and enforceable against each Member, and each Member irrevocably waives any appraisal or dissenters' rights the Member may have under Applicable Law or other applicable law.

(c)   On the adoption of any amendment to this Agreement, the amendment shall be executed by the Board and all of the Members and, only if necessary under applicable law, be recorded in the proper records of each jurisdiction in which recordation is necessary for the Company to conduct business or to preserve the limited liability of the Members. Each Member hereby irrevocably appoints and constitutes the Board as his agent and attorney-in-fact to execute, swear to, and record any and all such amendments. The power of attorney given herewith is irrevocable, is coupled with an interest and shall survive the leaving of a Member granting it.†

10.03   **Amendments on Admission or Withdrawal of Members.**   If this Agreement shall be amended to reflect the admission or substitution of a Member, the amendment to this Agreement shall be adopted, executed and sworn to by all Members and the Person to be substituted or added and the assigning Member. Any such amendment may be executed by the Board on behalf of the Members, the substituted or added Member, and the assigning Member pursuant to the power of attorney granted in Section 10.02(c).

10.04   **Amendment of Articles.**   In the event this Agreement shall be amended pursuant to this Article†X, the Board shall amend the Articles to reflect such change if it deems such amendment to be necessary.

## ARTICLE XI

## RECORDS AND ACCOUNTING; REPORTS; TAX MATTERS

11.01   **Records and Accounting.**   The books and records of the Company shall be kept on such basis of accounting, as may be determined by the Board. Proper and complete records and books of account of the business of the Company, including a list of the names and addresses and the number and class of Units of all Members, shall be maintained by the Board at the Company's principal place of business, and each Member or his duly authorized representative shall have access to them, upon reasonable notice and for a proper purpose, at all reasonable times during business hours. Any Member, or his duly authorized representatives, upon paying the costs of collection, duplication and mailing, shall be entitled for any proper purpose to a copy of the list of names and addresses and of the Members and number of Units held by the Members and other records or books specified in Applicable Law. Such information shall be used for Company purposes only. There shall be an interim closing of the books of account of the Company at such time as the Company's taxable year ends pursuant to the Code and at such other times as the Board determines is required under this Agreement.

11.02   **Tax Information.**   Within a reasonable period of time after the end of each calendar year, the Board will cause to be delivered to each Person who was a Member at any time during such calendar year all information necessary for the preparation of such Member's federal income tax returns, including a statement showing each Member's share of Profits or Losses, and the amount of any distribution made to or for the account of such Member pursuant to this Agreement.

11.03   Designation of Tax Matters Member.

(a)   Gustavo Sagastume shall act as the **[initial]** Tax Matters Member of the Company, as provided in Treasury Regulations pursuant to section 6231 of the Code (referred to therein as "tax matters partner"). Each Member hereby approves of such designation and agrees to execute, certify, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence such approval, including statements required to be filed with the tax returns of the Company in order to effect the election and designation of the foregoing Member as Tax Matters Member.

(b)   To the extent and in the manner provided by applicable Code sections and Treasury Regulations thereunder, the Tax Matters Member shall furnish the name, address, profits interest, and taxpayer



identification number of each Member (or assignee) or each indirect member (as defined in Section 6231(a)(10) of the Code) to the IRS. The Tax Matters Member shall have the duties and authority accorded to a tax matters partner in Sections 6221 through 6234 of the Code and the Treasury Regulations thereunder in the event of an administrative or judicial proceeding relating to the adjustment of Company items required to be taken into account by a Member or indirect member for United States federal income tax purposes.

(c)     Notwithstanding any other provision of this Agreement, the Company shall indemnify and reimburse, to the fullest extent provided by law, the Tax Matters Member for all expenses, including legal and accounting fees (as such fees are incurred), claims, liabilities, losses, and damages incurred in connection with any tax audit or judicial review proceeding with respect to the tax liability of the Members, the payment of all such expenses to be made before any cash distributions are made to the Members. No Member shall be obligated to provide funds for such purpose.

(d)     The Tax Matters Member may be removed as such and a successor designated from time to time pursuant to a Consent of the Members.

11.04   **Elections.** The Board may cause the Company to make all elections required or permitted to be made by the Company under the Code and not otherwise expressly provided for in this Agreement.

## ARTICLE XII

## MISCELLANEOUS

12.01   **Notification.**

(a)     Any Notification to any Member shall be at the address of such Member set forth in Exhibit "A" hereto or such other mailing address of which such Member shall advise the Board in writing. Any Notification to the Company or the Board shall be at the principal office of the Company set forth in Section 1.02. The Board may change the location of the Company's principal office upon Notification thereof to the Members.

(b)     Any Notification shall be deemed to have been duly given if personally delivered or sent by United States mail or by facsimile transmission confirmed by letter and will be deemed given, unless earlier received (i) if sent by certified or registered mail, return receipt requested, five calendar days after being deposited in the United States mails, postage prepaid; (ii) if sent by United States Express Mail, two calendar days after being deposited in the United States mails, postage prepaid; (iii) if sent by facsimile transmission, the date sent provided confirmatory Notification was sent by first-class mail, postage prepaid; and (iv) if delivered by hand, on the date of receipt.

12.02   **Governing Law; Separability of Provisions.** It is the intention of the parties that the internal laws of the Charter State shall govern the validity of this Agreement, the construction of its terms and interpretation of the rights and duties of the parties. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected thereby.

12.03   **Entire Agreement.** This Agreement (including any Exhibits and Schedules attached hereto) and other documents delivered at the Closing Date pursuant hereto, contains the entire understanding of the parties in respect of its subject matter and supersedes all prior agreements and understandings (oral or written) between or among the parties with respect to such subject matter. Any Exhibits and Schedules constitute a part hereof as though set forth in full above.

12.04   **Amendment; Waiver.** This Agreement may not be modified, amended, supplemented, canceled or discharged, except as provided in this Agreement. No failure to exercise, and no delay in exercising, any right, power or privilege under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege hereunder preclude the exercise of any other right, power or privilege. No waiver of any breach of any provision shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision, nor shall any waiver be implied from any course of dealing between the parties. No extension of time for performance of any obligations or other acts hereunder or under any other agreement shall be deemed to be an extension of the time for performance of any other obligations or any other acts. The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or equity, that they may have against each other.

12.05   **Binding Effect; Assignment.** The rights and obligations of this Agreement shall bind and inure to the benefit of the parties and their respective successors and assigns. Nothing expressed or implied herein shall be construed to give any other person any legal or equitable rights hereunder. Except as expressly provided herein, the rights and obligations of this Agreement may not be assigned by any of the parties.