12.06  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

12.07  **Interpretation.**  When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated.  The headings contained herein and on the schedules are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or the schedules.  Time shall be of the essence in this Agreement. For purposes of applying the Regulations to the Company and the Members, references in the Regulations to partnerships and partners shall be interpreted as applying to the Company and Members, respectively.

12.08  **Arm's Length Negotiations.**  Each party herein expressly represents and warrants to all other parties hereto that (a) before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) said party has relied solely and completely upon its own judgment in executing this Agreement; (c) said party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) said party has acted voluntarily and of its own free will in executing this Agreement; (e) said party is not acting under duress, whether economic or physical, in executing this Agreement; and (f) this Agreement is the result of arm's length negotiations conducted by and among the parties and their respective counsel.

[Signatures On Following Page]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

THE COMPANY:

**ADG International, LLC**

By:Gustavo Sagastume

Name: _____ 11/26/07
Title: President

MEMBERS:

By : Alida Vallini,

Title: Treasurer     11/26/07

By: Davide Lenardi
Name: _____ 11/26/07
Title: Secretary

EXHIBIT "A"

| Name and Address of Member | Capital Contribution of the Member | Number of Units Issued to the Member |
|---|---|---|
| Alida Vallini Corso Libertà n. 9, 39100   BOLZANO ITALIA | | 25% |
| | 25% | |
| Davide Leinardi Via molino dei fichi n.9 56034 CASCIANA TERME - PISA ITALIA | | 25% |
| | 25% | |
| Gustavo Sagastume 1428 Lantana Drive Weston, FL 33326 | | 50% |
| | 50% | |



*Invoice*

*Invoice Number:*
*18855*
*Invoice Date:*
*Sep 30, 2009*
*Page:*
*1*

**Voice:** 212-566-5540
**Fax:** 212-566-5547

**Sold To:**                                    **Ship to:**

**MARZANO & SEDIVA**
**65 BROADWAY**
**ALEXANDER SEDIVA SUITE 705**
**NEW YORK, NY 10006**

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| *MARZANO & SEDIVA* | *VALLINI* | *C.O.D.* | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| | *Hand Deliver* | | *9/30/09* |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1,023 | 8.5X11 WHT | 8.5X11 20LBS WHITE BOND 11 COPIES EACH | 0.120 | 122.76 |
| 110 | TABS | TABS BOTTOM EXHIBIT | 0.250 | 27.50 |
| 11 | VELO | VELO-BIND BOOKS | 2.500 | 27.50 |
| 93 | IMAGE | IMAGE CAPTURE TO PDF | 0.140 | 13.02 |
| | | REQ BY: ALEXANDER | | |
| | | RE: VALLINI | | |
| | | JOB# SEPT241 | | |

FEIN # 13-4277095

| | |
|---|---|
| *Subtotal* | *190.78* |
| *Sales Tax* | *16.93* |
| *Freight* | *0.00* |
| *Total Invoice Amount* | *207.71* |
| *Payment/Credit Applied* | |
| *TOTAL* | *207.71* |

**Check No:**
**REMIT TO:**
**P.O. BOX 908**
**PECK SLIP STATION**
**NEW YORK, NY 10272-0908**

*MAKE CHECKS PAYABLE TO:*
*QUALITY IMAGING SERVICES, INC.*

# Exhibit E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LD of Leinardi Davide, ALIDA VALLINI  and
DAVIDE LEINARDI

                    **Plaintiffs,**

   -against-

INTERNATIONAL MEDIA LLC,
GUSTAVO SAGASTUME,
JOHN BIFFAR,
DREAMTIME ENTERTAIMENT, INC.,
KOCH ENTERTAINMENT LP,
 SANDRA CARTER GLOBAL, INC.,
and FORREST INCENTIVES LTD.

                    **Defendants**

                                        **<u>AFFIRMATION</u>**


----------------------------------------------------------------X

1.        I, **ELVIRA MARZANO,** an attorney duly admitted to practice law in the Courts of

the State of New York and in Italy,  being fluent in both Italian and English languages,

affirm that the annexed document entitled "Transfer of the contract  drawn up between LD

and Vatican Television Center on September the 20th 2007 to ADG International;

Production entitled John Paul II- A Saint for our time" is a true, correct and accurate

translation in English language from the Italian language of annexed document entitled

"Cessione contratto LD- Centro Televisivo Vaticano del 20.09.2007 a ADG International.

Produzione dal titolo "John Paul II-A Saint for our time".

DATED:        Salerno, Italy
              July 31, 2009


                                        _____
                                        Elvira Marzano Esq.

Messrs
LD of Leinardi Davide
16, Via della Democrazia
56020 Montopoli Val D'Arno (Pisa)
ITALY

and

Messrs
ADG  INTERNATIONAL
2040, Sherman Street
Hollywood, FL 33020
USA

**Re**: Transfer of the contract drawn up between 'LD' and 'Vatican Television Center' on Sept. 20th 2007 to ADG International; Production entitled *"John Paul II – A Saint of our time"*

Further to your communication of Nov. 25th 2007 in relation to the incorporation of your US company ADG International, herewith the CTV - Vatican Television Center - takes cognizance and authorizes that the rights concerning its own archive footage, acquired by LD of Leinardi Davide by contract drawn up on Sept. 20th, 2007 to be used in the production under discussion, will be given up to ADG International.

Therefore ADG International will be the new holder of the exploiting movie rights of the CTV archive footage as contained in the production under discussion according to the contract signed between CTV Vatican Television Center and LD of Leinardi Davide on Sept. 20th, 2007

Best regards

Dr. Roberto Romolo
Administrative Secretary
- signature -

Stamp of the
Vatican Television Center

**CENTRO TELEVISIVO VATICANO**

Città del Vaticano, 3 dicembre 2007

Prot. 396/2007

Spett.le
LD di Leinardi Davide
Via della Democrazia, 16
56020 Montopoli Val D'Arno (Pisa)
(ITALIA)

e

Spett.le
ADG INTERNATIONAL
2040 Sherman Street
Hollywood, FL 33020
(USA)

Oggetto: Cessione contratto LD – Centro Televisivo Vaticano del 20/09/2007 a ADG International
Produzione dal titolo *"John Paul II-A Saint of our time"*

Facendo seguito alla Vs. comunicazione del 25 novembre 2007 in relazione alla costituzione della società di diritto statunitense ADG International, con la presente il CTV Centro Televisivo Vaticano prende atto e autorizza a che i diritti relativi al proprio materiale di repertorio, acquisiti da LD di Leinardi Davide con contratto del 20 settembre 2007 per l'utilizzo del suddetto repertorio all'interno della produzione in oggetto, faranno capo a ADG International.

ADG International sarà quindi la società titolare dei diritti di sfruttamento del materiale di repertorio del CTV così come contenuti all'interno della produzione in oggetto secondo quanto stabilito dal contratto sottoscritto tra il CTV Centro Televisivo Vaticano e LD di Leinardi Davide in data 20 settembre 2007.

Distinti saluti

Dr. Roberto Romolo
Segretario Amministrativo

CENTRO TELEVISIVO VATICANO
00120 CITTA' DEL VATICANO

**Exhibit F**

Case 1:08-cv-00041-XXX Document 1-1 Filed 1/08/08 Page 10 of 47



# State of Florida

## Department of State

I certify from the records of this office that ADG INTERNATIONAL, L.L.C., is a limited liability company organized under the laws of the State of Florida, filed on January 28, 2008.

The document number of this company is L08000010082.

I further certify that said company has paid all fees due this office through December 31, 2008, and its status is active.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capitol, this the
Twenty-ninth day of January, 2008

Kurt S. Browning
Secretary of State

CR2EO22 (01-07)

FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS



| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List    Next on List    Return To List

No Events    No Name History

# Detail by Entity Name

## Florida Limited Liability Company

ADG INTERNATIONAL, L.L.C.

## Filing Information

Document Number    L06000010082
FEI Number         NONE
Date Filed         01/26/2006
State              FL
Status             ACTIVE

## Principal Address

2040 SHERMAN STREET
HOLLYWOOD FL 33020

## Mailing Address

2040 SHERMAN STREET
HOLLYWOOD FL 33020

## Registered Agent Name & Address

SAGASTUME, GUSTAVO
2040 SHERMAN STREET
HOLLYWOOD FL 33020

## Manager/Member Detail

Name & Address

Title MGRM

VAKINI, ALIDA
2040 SHERMAN STREET
HOLLYWOOD FL 33020

Title MGRM

LEINARDI, DAVIDE
2040 SHERMAN STREET
HOLLYWOOD FL 33020

## Annual Reports

No Annual Reports Filed

## Document Images

01/26/2006 -- Florida Limited Liability

Note: This is not official record. See documents if question or conflict.

408000010082



100115972901

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP     ☐ WAIT     ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____     Certificate of Status _____

Special Instructions to Filing Officer:

A. LUNT

JAN 2 9 2008

EXAMINER

Office Use Only

01/28/08--01029--012   **130.00

FILED

2008 JAN 28 P 3 45

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

# COVER LETTER

TO:   Registration Section
      Division of Corporations

SUBJECT: __ADG International, LLC__
         (Name of Limited Liability Company)

The enclosed Articles of Organization and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

__Gustavo    Sagasvme__
         (Name of Person)


_____
         (Firm/Company)


__2040   Sherman Street__
         (Address)

__Hollywood, Fl. 33020__
         (City/State and Zip Code)

For further information concerning this matter, please call:

__Gustavo Sagasvme__   at (954   647.8893
  (Name of Person)        (Area Code & Daytime Telephone Number)

Enclosed is a check for the following amount:

☐ $125.00 Filing Fee   ☒ $130.00 Filing Fee &   ☐ $155.00 Filing Fee &   ☐ $160.00 Filing Fee,
                          Certificate of Status       Certified Copy            Certificate of Status &
                                                    (additional copy is enclosed)  Certified Copy
                                                                                (additional copy is enclosed)

**Mailing Address**          **Street/Courier Address**
Registration Section         Registration Section
Division of Corporations     Division of Corporations
P.O. Box 6327                Clifton Building
Tallahassee, FL 32314        2661 Executive Center Circle
                             Tallahassee, FL 32301

FILED
2008 JAN 28 P 3 45
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

# ARTICLES OF ORGANIZATION FOR FLORIDA LIMITED LIABILITY COMPANY

## ARTICLE I - Name:
The name of the Limited Liability Company is:

ADG International , LLC.

(Must end with the words "Limited Liability Company," "L.L.C.," or "LLC.")

## ARTICLE II - Address:
The mailing address and street address of the principal office of the Limited Liability Company is:

**Principal Office Address:**

G. SAGASNME
2040 Sherman St
Hollywood, Fl 33020

**Mailing Address:**

G. Segasnme
2040 Sherman Street
Hollywood, Fl. 33020

## ARTICLE III - Registered Agent, Registered Office, & Registered Agent's Signature:
(The Limited Liability Company cannot serve as its own Registered Agent. You must designate an individual or another business entity with an active Florida registration.)

The name and the Florida street address of the registered agent are:

GUSTAVO SAGASNME
Name

2040 Sherman Street

Florida street address (P.O. Box NOT acceptable)

Hollywood, Fl. 33021
City, State, and Zip

FILED
2008 JAN 28 P 2:45
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 608, F.S.*

Registered Agent's Signature (REQUIRED)

**(CONTINUED)**
Page 1 of 2

**ARTICLE IV- Manager(s) or Managing Member(s):**
The name and address of each Manager or Managing Member is as follows:

**Title:**
"MGR" = Manager
"MGRM" = Managing Member

**Name and Address:**

MGRM _____     Atida Vallini _____

MGRM _____     Davide Leinardi _____

_____     _____

_____     _____

_____     _____

**FILED**
2007 JAN 28 P 3 45
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

(Use attachment if necessary)

**ARTICLE V:** Effective date, if other than the date of filing: _____ (OPTIONAL)
(If an effective date is listed, the date must be specific and cannot be more than five business days prior to or 90 days after the date of filing.)

**REQUIRED SIGNATURE:**

_____
Signature of a member or an authorized representative of a member.

(In accordance with section 608.408(3), Florida Statutes, the execution of this document constitutes an affirmation under the penalties of perjury that the facts stated herein are true.)

Typed or printed name of signee

**Filing Fees:**

$125.00 Filing Fee for Articles of Organization and Designation
    of Registered Agent
$ 30.00 Certified Copy (Optional)
$ 5.00 Certificate of Status (Optional)

Page 2 of 2

# Exhibit G

# Sandra Carter Global, Inc.

### 43-32 22nd Street #300  Long Island City, NY  11101
phone: 718-752-9252  fax: 718-752-9256
info@sandra-carter.com   www.sandra-carter.com

October 31, 2007

International Media
2040 Sherman Street
Hollywood, FL 33020

Attention: Gustavo Sagastume

Re: Distribution agreement

Dear Gustavo:

This agreement dated October 31, 2007 when countersigned by the parties, shall constitute an
agreement between ADG International Media located at 2040 Sherman Street, Hollywood, FL.
33020, Attention:, Gustavo Sagastume (President), and Sandra Carter Global, Inc. located at the
above mentioned address , Attention: Sandra Carter, President (SCG), to appoint SCG as the
exclusive distributor of the Property, in the Territory and Grant of Rights, as defined below.

1.  Property: The property, "__John Paul II: A Saint for our Times"_____ "
    consisting of one (1) episode with a running time of _Approx. 60__ minutes (the "Property").

2.  Grant of Rights: Owner grants to SCG the exclusive and irrevocable right in the Territory to
    distribute, sell, license, lease and exploit the Property, trademark, logo in all sources, uses of
    media including but not limited to any form of standard and nonstandard television including,
    without limitation, free, pay, subscription, cable, direct broadcast satellite, VOD, mobile,
    broadband, interactive multimedia, educational and any other media whether now known or
    hereafter devised, theatrical distribution, and merchandising, now known or hereafter devised.
    Rights to also include schools, institutions, hotels and motels (including pay TV and pay per
    view), ships (including, but not limited to, oil rigs, transportation, merchant and cruise ships),

3.  Territory: SCG shall have the right to distribute the Property throughout the world, excluding the
    United States and Canada.  Canada will be available July 1, 2008.

4.  Term: Three (3) years with a three (3) year right to license period. This term shall automatically
    renew for an additional two (2) years at the end of each said term unless either party give
    written notice sixty (60) days prior to the expiration of said term.

5.  Fees and reporting and payments: Thirty percent (30%) of the gross receipts from the
    distribution of the Series in all forms of media, such fee shall include standard distribution
    expenses and fees. Additional commissions paid to outside sales representatives will also be
    deducted. SCG will report and remit all moneys due to Owner within sixty (60) days after each
    calendar quarter.

6.  Audit rights: Owner shall have the right to audit the sales records, with one-week notice, one (1) time per year. This audit shall include all sales, manufacturing, shipping and fulfillment records pertinent to the Series. In the event that any audit reveals discrepancies in excess of ten percent (10%) of amounts owing to Owner, SCG shall be responsible for the costs of such audit and promptly remit all amounts owed, within five (5) business days of receipt of such audit report.

7.  Assignment: This Agreement may be assigned by either party to such party's parent, subsidiary or affiliated company, or to a company with which it may be merged or consolidated, or which acquires all or substantially all of such party's assets, without the consent of the other party. No assignment such assignment shall be effective until the assignee expressly assumes all of the assigning party's obligations in writing. The parties expressly agree that no other assignment of this Agreement shall be effective without the consent of the other party. This Agreement shall not be deemed to constitute a joint venture, partnership, pooling arrangement, formal business entity or any type of permanent arrangement, and the employees of one party shall not be deemed employees of the other.

8.  Indemnification: (a) Owner agrees to indemnify and hold all parties harmless from any and all third party claims, damages, liabilities, costs and expenses, including reasonable counsel fees suffered or incurred by SCG, its sub-licensees, its parents, subsidiaries or affiliates and its directors, officers, agents and employees, arising out of or based upon any of the following:

    (i)    any claim which may be made alleging that any material contained in the Property infringes upon the trade name, trademark, copyright, literary or dramatic right or any right of publicity or privacy or other right of any claimant, or constitutes a libel or slander of such person, except with respect to any material added by SCG;

    (ii)   any fee, Publishing, compensation or any other payment whatsoever alleged to be payable by Licensee to any producer, director, actor, writer or any other person who performed services in or in connection with the Property;

    (iii)  any breach by Owner, its directors, officers, employees or representatives of any of Owner's representations, warranties, agreements, obligations, or covenants contained in this Agreement.

    (b) SCG shall at all times indemnify and hold harmless Owner and its agents, from and against all third party claims, damages, liabilities, costs and expenses, including reasonable counsel fees, suffered or incurred by Owner, its parents, affiliated and subsidiary companies and its directors, officers, agents and employees arising out of any of SCG's representations, warranties, agreements, obligations or covenants contained in this Agreement or any material added to the Property by SCG, including commercials and advertisements of the Property.

    (c) the indemnification provided for herein is subject to the condition that the party seeking indemnification shall promptly notify the indemnifying party of any claim or litigation. In addition the indemnifying party may, at its option, assume the handling, settlement or defense of any claim or litigation. In such case, the indemnifying party is obligated and limited to holding the indemnified party harmless from any judgment paid on account of such claim or litigation, or any settlement made or approved by the indemnifying party in connection herewith.

    (d) the party seeking indemnification shall fully cooperate with the reasonable requests of the indemnifying party in its participation in, and control of, any compromise, settlement, litigation or other resolution or disposition of any claim or litigation.

9. Delivery Materials: Owner. shall, at its sole cost and expense, create and deliver to SCG the Delivery Requirements set forth in Exhibit "A". The Delivery Requirements shall meet the standards and qualifications required by SCG for the distribution of the Property.  In Addition, Owner will make available other language masters (Spanish, Polish, Portuguese, etc) as they become available for distribution at it's own expense. Distributor agrees to sell programs to markets as English  version, other language versions (as available) or as M&E masters for markets' own language dubbing.

10. Copyright: Owner has protected the Property by placing a proper copyright notice in the Property and by registering the copyright with the appropriate copyright office within the United States of America or other legal jurisdiction to be named.

11. Insurance: Owner shall obtain and maintain throughout the term the customary Errors and Omissions Insurance at its own costs and expense and SCG shall be named as an additional insured.

12. Owner shall provide SCG with a clear chain-of-title.

13. Owner shall be responsible for all applicable guild and union residuals and reuse payments plus fringes and all other required contingent payments.

14. General Provisions:  (a) This Agreement shall be construed, interpreted and enforced with and shall be governed by the laws of the State of New York and the city of New York applicable to agreements entered into and wholly to be performed therein.  Any controversy or claim arising out of or relating to this Agreement including, without limitation, the interpretation or the breach thereof, shall be settled by arbitration in either the State of New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association then obtain, and judgment upon the award rendered by a panel of one (1) Arbitrator may be entered in any Court having jurisdiction thereof.  Arbitration shall permit discovery. Notwithstanding the foregoing, this agreement to arbitrate shall not bar either party from seeking temporary or provisional remedies in any Court having jurisdiction thereof. (b) This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof(c) This Agreement is solely for the benefit of the parties hereto and shall not inure to the benefit of any third party (d) This Agreement may not be modified or waived in whole or in part except in writing, signed by a duly authorized officer of the parties. (e) A waiver or any of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be waived of such term or condition for the future, or of any subsequent breach thereof. (f) The captions and headings of the Section of this Agreement are for convenience only, and shall not in any way affect the interpretation of any Section of this Agreement or the Agreement itself. (g) Each party hereto shall execute any and all further documents or amendments, which either party hereto may reasonably deem necessary and proper to carry out the purposes of this Agreement. (h) Any provisions of this Agreement or any riders or amendments thereto found to be contrary to any law or regulation of an administrative or governmental agency or body shall not affect the other provisions of this Agreement or any riders or amendments thereto, and said other provisions shall continue in full force and effect.

Please do not hesitate to contact me if you have any questions or comments.

Sincerely,

Sandra Carter

Enclosures

Agreed to and Accepted:

_____ Dated: _____

## SCHEDULE "A"
## DELIVERY REQUIREMENTS

Delivery of each of the episodes of the Property shall consist of making physical delivery of the following items in the English language to Sandra Carter Global, Inc (SCG) at 43-32 22nd Street Suite 300, Long Island City, NY 11101.  All video and audio elements shall be of first class technical quality.

## I. VIDEO AND AUDIO ELEMENTS TO BE DELIVERED

All videotapes shall be delivered with drop frame time code for NTSC and EBU time code for PAL and a 30 second slate to include Program name, episode title and number, name of the production company, name of the lab where such videotapes were produced and the date of production.

A.   Videotape Master: One (1) full frame (i.e. letter box is not acceptable) first generation BETA-SP NTSC and PAL Telecine master, color corrected videotape of the complete Program encoded with Dolby "A" Noise Reduction and complete stereo audio on Channels 1 and 2, and Stereo M&E Tracks on Channels 3 and 4, from which one or more dubbing masters of first class technical quality can be manufactured.  If the videotape is to be delivered with monaural audio rather than stereo, then approval in writing from SCG shall be required.

B.   Trailer and Promo Material: One (1) NTSC and one (1) PAL Beta-SP videotape master of each existing trailer and promotional spot if available.

C.   Music and Effects Audio Track: The music and effects must be separated on at least two (2) channels, and the effects channel must be fully mixed in the same manner as the Videotape Master. No dialogue or cross-talk shall bleed into the music or effects channel.

D.   Textless Title Backgrounds: One (1) new BETA-SP NTSC and PAL Telecine master videotape of all letter or title backgrounds, or both, recorded directly from the original recorded masters (ORMs) of those scenes or backgrounds *without text.*

## II. CREDITS AND RESTRICTIONS

A.   Video Packaging Credits: If applicable, one (1) typewritten copy of the credits to be given on all packaging for videos embodying each of the Pictures with the appropriate contractual language relating to such credits.

B.   Dubbing and Subtitling Restrictions: One (1) typewritten copy of all dubbing and subtitling restrictions relating to the replacement of any player's choice, including the dubbing of dialogue in a language other than that in which each of the episodes of the Property was originally recorded.

C.   Paid Ad Credits: One (1) typewritten copy of a statement of credit billings, listing all cast and production credits for the Property to be given in paid advertising together with the applicable contractual language relating to such advertising.

## III. PROMOTIONAL AND OTHER DOCUMENTATION

A.   Promotional Materials: Two (2) copies of each of the following, if available (where possible, original art work for each of the following should not be delivered):
   a)   All advertisements, promotional materials, including samples of all printed one-sheets, lobby cards, sales/promotion sheets, brochures, and posters, either in hard printed format or electronic format in 300dpi or greater jpeg
   b)   Ad slicks and advertising mats;
   c)   300dpi of greater resolution of the logo or title treatment; the credit block to scale; Licensor's trade name or logo; an 8x10 color transparency of the key art (which should not include the logo or title treatment) necessary to make color separations and/or proofs thereof; and

     d)      Copies of all available press clippings.

**B.**   **Photographic Material:** All available original color and B&W images in 300 dpi resolution jpeg format (or transparencies, if original negatives are not available) of different color and B&W images with backgrounds depicting different scenes from each of the episodes of the Property; the majority of which shall depict the characters of the Property. All images must be suitable for use in the preparation of advertising, publicity, promotional and packaging for each of the episodes of the Property. Each image must be accompanied by a title descriptive of the scene depicted and names of the performers shown in the image.

**C.**   **Cast and Crew:** One (1) copies of cast and crew list for each of the episodes of the Property and biographies of each member of the key cast and production staff.

**D.**   **Synopsis:** One (1) copy of a synopsis of each of the episodes of the Property.

**E.**   **Shooting Script:** One (1) copy of the final time coded shooting script of each of the episodes of the Property, delivered electronically.

## IV. MUSIC DOCUMENTATION

**A.**   **Music Cue Sheets:** One (1) typewritten copy of the music cue sheets detailing the particulars of all music contained in each of the episodes of the Property, in whole or in part, whether or not originally composed for such use, including:
    a)      The title;
    b)      Type of use;
    c)      Duration, place and number of use;
    d)      Name(s) and address(es) of composer(s), lyricist(s), publisher(s), copyright proprietor(s), and performing rights licensor(s);
    e)      Synchronization rights licensor(s);
    f)      Film footage and running time for each use;
    g)      The performing rights society involved;
    h)      If available, a legible photographic copy of the "lead sheet" of each musical composition embodied in the soundtrack of each of the episodes of the Property which is owned or controlled by Licensor;
    i)      Any other information customarily set forth in music cue sheets and sufficient documentation to show that all music rights have been cleared for the distribution of the Property throughout the Licensed Territory.

**B.**   **Music License Materials:** One (1) copy of each music synchronization, performance and mechanical license covering each musical composition embodied in the Program and not in the public domain.

## V. LEGAL DOCUMENTATION

**A.**   **Title and Copyright Report:** One (1) copy of the title search report and copyright search report.

**B.**   **Copyright Registration:** One (1) copy of Licensor's registration of its claim to copyright in each of the episodes of the Property which has been registered in the copyright office of the Library of Congress, and when available, one (1) certified copy of the Certificate of Registration and all other recorded documents demonstrating Licensor's claim to copyright to each of the episodes of the Property issued by the Copyright Office.

**C.**   **Chain of Title Documents:** One (1) copy of the chain-of-title documents including, but not limited to, legible copies of all contracts covering the acquisition of literary, dramatic and other works and material of whatever nature upon which the Property may be based and/or used in the production of the Property, and one (1) copy of a notarized Certificate of Origin, and one (1) copy of the notarized

Certificate of Authorship for every writer listed in the credits of the Property.

D.    Releases: One (1) copy of the following:
     a)   Each signed release for any person seen in the Property, including, but not limited to, guests, reality show appearances, interviewees, background or "atmosphere" extras, etc.; and
     b)   All location releases.

E.    Availability: Availability listing for the Property for the Licensed Territory, including full report of all previous sales.

F.    Miscellaneous:
     1.   A statement regarding the contractual requirements of all applicable union, guild and federation agreements, including a copy of said agreements; and
     2.   One (1) copy of the short form Memorandum of Exclusive License.

## VI. INSURANCE

A.    Licensor shall obtain and maintain Errors and Omissions insurance coverage as set forth below, and shall deliver certificates to Sandra Carter Global (SCG) evidencing such coverage. Such insurance shall meet the following requirements:
     a)   Limits of liability of not less than $1,000,000 for any single party's claim arising out of any single occurrence and $3,000,000 for all claims in the aggregate arising out of a single occurrence and shall not carry a deductible larger than $10,000;
     b)   Pursuant to its terms, it shall provide primary and not contributing coverage notwithstanding any other errors and omissions insurance which Licensor may obtain or maintain; and
     c)   Coverage shall be maintained in full force and effect by Licensor at Licensor's sole cost and expense and, with respect to the production of each of the episodes of the Property produced hereunder (collectively, "Property[ies]"), commencing at least thirty (30) days prior to the start date of principal photography and continuing for a period of not less than three (3) years following the last general exhibition thereof by or through SCG, it being understood that in the event of cancellation or non-renewal, Licensor shall obtain and maintain a substitute policy thereof (and promptly deliver to SCG evidence of the maintenance of such substitute policy). There shall be no cancellation or non-renewal prior to SCG's receipt of not less than sixty (60) days' written notice thereof. SCG shall be added as an additional insured as its interest may appear under such policy.

B.    Prior to the purchase of said insurance, Licensor shall obtain written approval of SCG's risk management department so as to guarantee that the following insurance requirements are met:
     a)   All insurance required hereunder shall be evidenced by policies, endorsements or certificates and shall be obtained through an acceptable insurance company approved by SVCG; and
     b)   All insurance shall be adequate in form and substance for proper certification to SCG as to insurance, coverage, valuation and adequacy of pricing.

C.    Licensor shall have the right to use the proceeds of any insurance loss recovered prior to completion and delivery of the Property(ies) solely for the production of the Property(ies) in the manner provided for herein and subject to the terms and conditions hereof. In the event any proceeds of any insurance loss are recovered after the completion and delivery of the Property(ies), such proceeds shall be applied in reduction of the amounts paid by the completion guarantor, if any, and the balance remaining, if any, shall be applied in reduction of any amounts payable by SCG to Licensor. All insurance carriers from which any policies are secured by Licensor pursuant hereto shall be duly licensed under the laws of the State of California and shall be fully qualified to do business in said State.

D.    If any such policy shall be terminated or altered without SCG's prior written consent, or if Licensor

fails to timely obtain and maintain any of the foregoing coverages or if Licensor fails to obtain forthwith a substitute policy satisfactory to SCG, SCG may, but is not required, obtain and maintain such policy and/or terminate the Agreement. In the event that SCG itself obtains such a policy then any expense or cost incurred by SCG shall be borne solely by Licensor in which event SCG may deduct the premiums for such policy from any payments otherwise due from SCG to Licensor or bill Licensor for the same. In the event that SCG terminates the Agreement then upon SCG's written notice of termination to Licensor, Licensor shall immediately reimburse SCG for all of SCG's unrecouped expenses associated with the Property(ies). In the event of such termination, the terms of all license agreements for the Property(ies) made pursuant to this Agreement prior to such termination shall continue in full force and effect for their term. SCG's exercise of or failure to exercise any right specified in the preceding sentence shall not constitute a waiver of any other rights that SCG may have to damages or otherwise or operate as a discharge of any of Licensor's obligations.

## VII. DESIGNATED DELIVERY LOCATION

All items shall be delivered to SCG:

Sandra Carter Global
43-32 22nd Street Suite 300
Long Island City, NY 11101
Attention: Traffic Department

Telephone:  718-752-9252
Facsimile:    718-752-9256

Accepted and agreed:

By:

Name:  Gustovo Sagastume / International Media

Date   2/14/08



# forest incentives ltd.

**230 Fairhill Street, Willow Grove, PA 19090**
**Satellite Office – 4406 Kahn Drive, Erie, PA 16509**

tel 215-659-1800 * fax 215-659-1830
tel 814-866-5173 * fax 814-868-3898

Gustavo Sagastume
ADG International Media
2040 Sherman Street
Hollywood, FL 33020

October 31, 2007

Re:     Consignment/Distribution Agreement
          **"Pope John Paul II: A Saint for Our Times"**

Dear Gustavo:

This document represents an agreement between Forest Incentives Ltd. and International Media for handling the distribution of your program "Pope John Paul II: A Saint for Our Times". The item, which is to be distributed to the PBS stations, is listed below along with the station sell price, Forest's fulfillment fee, and a list of how we will promote and handle the distribution of your product.

**Distribution Fee:** $1.60 per item or 20% of the selling price to stations, whichever is greater.

| **"Pope John Paul II…"** | **Selling Price to Stations** | **Fulfillment Charge** |
|---|---|---|
| DVD – 60 min. | $10.00 | $1.90 |

   a.  Forest will include your product(s) in our next Premium Guide mailing which is sent out to all PBS television stations. Our web site, which is accessible to all PBS stations, also has our catalog online. Stations have the ability to order directly online from our web store. Forest will also feature your product(s) as part of our regular e-mail updates to the stations.
   b.  In between catalogs, Forest will work with you to get any messages out that are necessary to update information about your product(s) to the stations.
   c.  Forest will handle all phone calls and customer service (i.e. handling returns of defective merchandise, shipment tracking, questions regarding the product(s), etc.).
   d.  Forest will handle sending out samples per individual station request and will, if directed by you, send mass mailings with our catalog to all of the stations that would include a sample sleeve at no extra cost.
   e.  Forest will provide all of the packing materials, handling, boxing and shipping the orders, and charge the stations standard UPS Ground Freight, plus handling.

1



f. Forest will bill the stations for product and shipping, and will take responsibility for collections and non-payment.

g. Forest will warehouse your products that are needed for the catalog at no charge to you. Warehousing and storage of product beyond the program's needs is available at an additional charge. We will insure your goods and be responsible for any lost goods once we have accepted them into our warehouse (our offices and warehouse are in the same location to enable better service).

h. **ADG International Media** will be responsible for the delivery of goods to Forest Incentives, including freight charges. Any shipment directed by ADG **International Media** outside of the PBS realm, which are over 10 pieces, will be charged a handling fee of $.50 per item, plus freight, including shipments to ADG **International Media.** Shipments of 10 items or less will be charged a handling fee of $2.00 each, plus freight.

i. Forest will set up our computer to notify you of low inventory, at whatever level you designate, so you can reorder goods in a timely fashion.

j. Forest will prepare a monthly sales report for product sold. Inventory reports will be available to you between monthly reports at your request by calling or faxing. Monthly reports are rigorously double-checked. Inventory reports will be defined by computer data.

k. The duration of the agreement is for the airing rights of the program, plus 60 days. Either party can terminate the agreement with 60 days written notice sent to the addresses listed at the beginning of the agreement.

## Financial Reporting:

While you are free to set whatever inventory levels you deem appropriate, ADG **International Media** shall be paid for only those products that have been determined "sold", defined as shipped and invoiced. A monthly reconciliation report will be provided. Monies due ADG **International Media** will be paid 45 days from the end of the month during which the products were determined "sold", less Forest's fulfillment charges as stated under the <u>Distribution Fee</u> paragraph of this document, as well as any outstanding monies due Forest, including, but not limited to production fees.

Please sign below and fax the signed agreement to my attention to 814-868-3898.

Sincerely,

Audrey K. Parmenter
Sales & Administration

Gustavo Sagastume                    Date
ADG International Media



**forest incentives ltd.**

230 Fairhill Street, Willow Grove, PA 19090          tel 215-659-1800 * fax 215-659-1830
Satellite Office – 4406 Kahn Drive, Erie, PA  16509          tel 814-866-5173 * fax 814-868-3898

Gustavo Sagastume                                             October 31, 2007
ADG International Media
2040 Sherman Street
Hollywood, FL  33020

Re:     Consignment/Distribution Agreement
        **"Pope John Paul II: A Saint for Our Times"**

Dear Gustavo:

This document represents an agreement between Forest Incentives Ltd. and International
Media for handling the distribution of your program "Pope John Paul II: A Saint for Our
Times". The item, which is to be distributed to the PBS stations, is listed below along
with the station sell price, Forest's fulfillment fee, and a list of how we will promote and
handle the distribution of your product.

**Distribution Fee:** $1.60 per item or 20% of the selling price to stations, whichever is greater.

| **"Pope John Paul II…"** | **Selling Price to Stations** | **Fulfillment Charge** |
|---|---|---|
| DVD – 60 min. | $10.00 | $1.90 |

   a. Forest will include your product(s) in our next Premium Guide mailing which is
      sent out to all PBS television stations. Our web site, which is accessible to all
      PBS stations, also has our catalog online. Stations have the ability to order
      directly online from our web store. Forest will also feature your product(s) as part
      of our regular e-mail updates to the stations.
   b. In between catalogs, Forest will work with you to get any messages out that are
      necessary to update information about your product(s) to the stations.
   c. Forest will handle all phone calls and customer service (i.e. handling returns of
      defective merchandise, shipment tracking, questions regarding the product(s),
      etc.).
   d. Forest will handle sending out samples per individual station request and will, if
      directed by you, send mass mailings with our catalog to all of the stations that
      would include a sample sleeve at no extra cost.
   e. Forest will provide all of the packing materials, handling, boxing and shipping the
      orders, and charge the stations standard UPS Ground Freight, plus handling.



**forest incentives ltd.**

f.  Forest will bill the stations for product and shipping, and will take responsibility for collections and non-payment.

g.  Forest will warehouse your products that are needed for the catalog at no charge to you. Warehousing and storage of product beyond the program's needs is available at an additional charge. We will insure your goods and be responsible for any lost goods once we have accepted them into our warehouse (our offices and warehouse are in the same location to enable better service).

h.  **ADG International Media** will be responsible for the delivery of goods to Forest Incentives, including freight charges. Any shipment directed by ADG **International Media** outside of the PBS realm, which are over 10 pieces, will be charged a handling fee of $.50 per item, plus freight, including shipments to ADG **International Media.** Shipments of 10 items or less will be charged a handling fee of $2.00 each, plus freight.

i.  Forest will set up our computer to notify you of low inventory, at whatever level you designate, so you can reorder goods in a timely fashion.

j.  Forest will prepare a monthly sales report for product sold. Inventory reports will be available to you between monthly reports at your request by calling or faxing. Monthly reports are rigorously double-checked. Inventory reports will be defined by computer data.

k.  The duration of the agreement is for the airing rights of the program, plus 60 days. Either party can terminate the agreement with 60 days written notice sent to the addresses listed at the beginning of the agreement.

**Financial Reporting:**

While you are free to set whatever inventory levels you deem appropriate, ADG **International Media** shall be paid for only those products that have been determined "sold", defined as shipped and invoiced. A monthly reconciliation report will be provided. Monies due ADG **International Media** will be paid 45 days from the end of the month during which the products were determined "sold", less Forest's fulfillment charges as stated under the Distribution Fee paragraph of this document, as well as any outstanding monies due Forest, including, but not limited to production fees.

Please sign below and fax the signed agreement to my attention to 814-868-3898.

Sincerely,

Audrey K. Parmenter          Gustavo Sagastume          12/1/07
Sales & Administration        ADG International Media     Date

2



# forest incentives ltd.

230 Fairhill Street, Willow Grove, PA 19090        tel 215-659-1800 * fax 215-659-1830
Satellite Office – 4406 Kahn Drive, Erie, PA 16509    tel 814-866-5173 * fax 814-868-3898

Gustavo Sagastume                       October 31, 2007
International Media
2040 Sherman Street
Hollywood, FL 33020

Re:     Consignment/Distribution Agreement
        **"Pope John Paul II: A Saint for Our Times"**

Dear Gustavo:

This document represents an agreement between Forest Incentives Ltd. and International Media for handling the distribution of your program "Pope John Paul II: A Saint for Our Times". The item, which is to be distributed to the PBS stations, is listed below along with the station sell price, Forest's fulfillment fee, and a list of how we will promote and handle the distribution of your product.

**Distribution Fee:** $1.60 per item or 20% of the selling price to stations, whichever is greater.

| "Pope John Paul II…" | Selling Price to Stations | Fulfillment Charge |
|---|---|---|
| DVD – 60 min. | $10.00 | $1.90 |

  a.  Forest will include your product(s) in our next Premium Guide mailing which is sent out to all PBS television stations. Our web site, which is accessible to all PBS stations, also has our catalog online. Stations have the ability to order directly online from our web store. Forest will also feature your product(s) as part of our regular e-mail updates to the stations.

  b.  In between catalogs, Forest will work with you to get any messages out that are necessary to update information about your product(s) to the stations.

  c.  Forest will handle all phone calls and customer service (i.e. handling returns of defective merchandise, shipment tracking, questions regarding the product(s), etc.).

  d.  Forest will handle sending out samples per individual station request and will, if directed by you, send mass mailings with our catalog to all of the stations that would include a sample sleeve at no extra cost.

  e.  Forest will provide all of the packing materials, handling, boxing and shipping the orders, and charge the stations standard UPS Ground Freight, plus handling.

1



f.  Forest will bill the stations for product and shipping, and will take responsibility for collections and non-payment.

g.  Forest will warehouse your products that are needed for the catalog at no charge to you. Warehousing and storage of product beyond the program's needs is available at an additional charge. We will insure your goods and be responsible for any lost goods once we have accepted them into our warehouse (our offices and warehouse are in the same location to enable better service).

h.  **International Media** will be responsible for the delivery of goods to Forest Incentives, including freight charges. Any shipment directed by **International Media** outside of the PBS realm, which are over 10 pieces, will be charged a handling fee of $.50 per item, plus freight, including shipments to **International Media**. Shipments of 10 items or less will be charged a handling fee of $2.00 each, plus freight.

i.  Forest will set up our computer to notify you of low inventory, at whatever level you designate, so you can reorder goods in a timely fashion.

j.  Forest will prepare a monthly sales report for product sold. Inventory reports will be available to you between monthly reports at your request by calling or faxing. Monthly reports are rigorously double-checked. Inventory reports will be defined by computer data.

k.  The duration of the agreement is for the airing rights of the program, plus 60 days. Either party can terminate the agreement with 60 days written notice sent to the addresses listed at the beginning of the agreement.

**Financial Reporting:**

While you are free to set whatever inventory levels you deem appropriate, **International Media** shall be paid for only those products that have been determined "sold", defined as shipped and invoiced. A monthly reconciliation report will be provided. Monies due **International Media** will be paid 45 days from the end of the month during which the products were determined "sold", less Forest's fulfillment charges as stated under the Distribution Fee paragraph of this document, as well as any outstanding monies due Forest, including, but not limited to production fees.

Please sign below and fax the signed agreement to my attention to 814-868-3898.

Sincerely,

Audrey K. Parmenter                    Gustavo Sagastume          12/7/87
Sales & Administration                 International Media          Date

2

ORIGINAL

# DISTRIBUTION AGREEMENT

By and Between

**International Media, LLC**
2040 Sherman Street
Hollywood, FL 33020

(herein referred to as "Company")

and

**KOCH Entertainment LP**
22 Harbor Park Drive
Port Washington, NY 11050-4617

(herein referred to as "Koch")

As of January 3, 2008

1

**DISTRIBUTION GRANT.** Company as a record and/or video company and manufacturer of Audio and Video Products and Koch as a distributor of Audio and Video Products wish to enter into an exclusive manufacturing and distribution agreement for the Territory for all of Company's mass-marketable Audio and Video Products sold through all wholesale and retail channels. "Audio and Video Products" or "Products" are all of Company's Compact-Discs, Cassettes, Digital Compact Cassettes, Minidiscs, Digital Versatile Discs (DVDs), VHS or other Videos or any other mass-marketable device containing pre-recorded music and/or visual images by which sound and/or visual images may be disseminated now or in the future, including but not limited to sales via Digital Entertainment Media Distribution ("DEMD"). "DEMD" means any transmission to the consumer, whether sound alone, sound coupled with an image, or sound coupled with data, in any form, analog or digital, now known or later developed (including, but not limited to, "cybercasts," "webcasts," "streaming audio," "streaming audio/video," "digital downloads," direct broadcast satellite, point-to-multipoint satellite, multipoint distribution service, point-to-point distribution service, cable system, telephone system, broadcast station, ring tones, ring backs, voice tones, pictones, and text messaging), and any other forms of transmission now known or hereafter devised) whether or not such transmission is made on-demand or near on-demand, whether or not a direct or indirect charge is made to receive the transmission and whether or not such transmission results in a specifically identifiable reproduction by or for any transmission recipient. "Company" is defined as the entity named herein as well as any affiliate of the Company or other entity or venture in which the shareholders of the Company have a qualified (i.e. at least fifty-one percent) interest or to which all or substantially all key assets of the Company have been transferred. This Agreement covers Company's Products as described on Schedule A.

Notwithstanding anything to the contrary contained herein, Koch will have the right, without liability to Company and without limiting Koch's other rights, to decline to distribute and otherwise exploit or to discontinue the distribution and other exploitation of any Company Products hereunder if, in the opinion of Koch's legal counsel, such distribution or other exploitation might violate any statute, law or regulation or violate or infringe the rights of any person, or if Koch believes that such distribution or other exploitation would constitute a breach by Company of any of Company's representations, warranties, covenants or agreements contained herein.  In addition, Koch will have the right at its sole option, without liability to Company and without limiting Koch's other rights, to decline to distribute and otherwise exploit any third party label in which Company does not have a qualified (i.e. at least twenty-five percent) interest.  Any Company Products or third party labels declined by Koch under this provision shall be excluded from this Agreement.  Company may exploit such Products through a third-party distributor provided that such Products are released with a different label name and barcode from Products released by Koch under this Agreement.

Except as expressly provided in this Agreement, nothing herein shall be construed to prevent or restrict Koch from distributing, selling, promoting or otherwise exploiting recordings of any kind, including those owned or controlled by Koch or any other person or entity, whether or not competitive with any Products distributed hereunder.

2

**TERM.** The term of this Agreement is three years, commencing on the date set forth in Schedule A.  If, at the end of the initial term or any applicable renewal term, there is an outstanding balance owed to Koch by Company or there is an Advance which has not been fully recouped, this Agreement shall automatically renew, at Koch's option, for an additional one-year term.

3

**TERRITORY.** Company appoints Koch as its exclusive national distributor for all of Company Products for the territory of the United States of America, including its possessions and military bases ("Territory").  Company appoints Entertainment One Limited Partnership D/B/A Koch Entertainment (Canada) for exclusive national distribution in Canada as per this Agreement and Schedule B of this Agreement.  Notwithstanding the foregoing, the Territory for sales via DEMD shall be the World.  Notwithstanding the foregoing, Company retains the exclusive right to sell to PBS stations via Forest incentives.

4

**CONSIGNMENT.** Company will have Koch exclusively manufacture its Products and Koch will do so on behalf and on account of Company. Company shall deliver to Koch's designated manufacturer (i) digital master tapes for the Masters technically and commercially satisfactory for the manufacture of records therefrom, (ii) CD or Zip Disks for the packaging artwork (e.g., photoshop, Illustrator, Quark in TIFF or EPS format) of the Album (iii) label copy and liner notes and all publishing credits (on disk) and (iv) any other elements or approvals reasonably requested by Koch. Any expenses incurred by Koch in preparing the Masters for the manufacture of phonorecords shall be deemed advances against net proceeds payable to Company pursuant to this agreement. Company is solely responsible for the cost of manufacturing and shipping to Koch's warehouse as per Schedule E of this Agreement, and all of Koch's manufacturing orders for Company Products are deemed approved by Company. Notwithstanding the foregoing, Koch shall notify Company prior to placing orders of 10,000 or more units per title. Company will provide all its Products to Koch on a consignment basis and remain the sole owner of its inventory until sold. Company loses title to its Products upon sale by Koch and Koch is the sole owner of the proceeds of Company's consigned goods (receivables). Company solely owns the inventory at Koch and will maintain adequate insurance coverage for its inventory at all times. Koch is responsible for the accuracy and completeness of Company's inventory, beyond the allowed maximum shrinkage of three (3.0) percent, at Company's last actual manufacturing cost. If a current (i.e. excluding returns reserves to be liquidated in the future) balance is due Koch, Koch is entitled to retain Company's inventory as collateral, refuse Company access to the inventory and liquidate Company's inventory.

Promptly following Koch's written request, Company shall remove from Koch's distribution center(s), or order the destruction of, all Surplus Inventory (as defined below). Koch will deduct from company's account all expenses in connection with any removal (including the Drop Shipping Fee defined herein) or destruction (the Scrap Fee defined herein) of Surplus Inventory, including without limitation any third party warehouse charges in connection therewith. Company shall be deemed to have ordered the destruction of Surplus Inventory if it has not removed such Surplus Inventory or given instructions for delivery thereof to a non-Koch facility within ten (10) days following Koch's written request as provided above. "Surplus Inventory" is defined as any inventory for a particular SKU in excess of a six (6) month supply (as determined in Koch's good faith business judgment). If Company requests continued storage by Koch of such Surplus Inventory and Koch agrees (without obligation) to such, Koch will charge fifteen (15) cents per unit per month for storage. Any inventory removed from Koch's distribution center(s) under this section shall continue to be subject to this Agreement, and Company shall not sell or permit the sale by any third party of such inventory in the territory and markets specified in this Agreement. Company will delete Products periodically at its option or upon Koch's request any title per format ("SKU") which has not shipped a minimum of three hundred (300) units to Koch's accounts during the previous twelve (12) months on a rolling basis. Koch will announce such deletions to its accounts and is provided fifteen (15) months to recall such Product from its customers. Company authorizes Koch to mark all deleted Product at Company's expense so as to prevent their return to Koch.

5

**PRICING.** The suggested retail list price of Company's product shall be established by Company in its sole discretion. However, Company shall not change the suggested retail list price of any specific Company releases without giving Koch written notice at least two (2) calendar months prior to the effective date of the change. Company's dealer cost prices are as per Koch's price card which is annexed hereto as Schedule D and which is subject to change by Koch. Company shall designate the release dates of all new Company Product within Koch's available street dates. If Koch accounts request a credit resulting from Company's price reduction on Products sold at any time in the past, Koch shall be entitled to take a credit against amounts otherwise owed Company in an amount equal to the amount of the credit granted to accounts by Koch.

6

**ACCOUNTING & PAYMENT.** Koch will account for monthly invoiced gross sales, credits for returns, discounts, co-op advertising and net sales. Koch will render a monthly detailed statement within fifteen (15) days from the end of the month and remit a check within ninety (90) days following the end of the month (EOM) or at Koch's option sixty (60) days EOM two (2) percent early payment discount for the Company Share percentage as per Schedule A of monthly Net Sales (gross sales minus credits for returns, after discounts). Koch will retain the Koch Share percentage as per Schedule A of monthly Net Sales as its distribution commission. Koch is authorized to grant free goods and/or discounts on Company Products. Koch invoices in its name, but does not

assume bad debts. Bad debts are borne as follows: Company Share percentage by Company and Koch Share percentage by Koch.

In the event Koch is charged by its customers, pursuant to a published policy of such customers, in connection with the non-compliance of the Product with such customers' published policies, any such costs charged to Koch shall be charged back to Company by Koch. Examples of such charges shall include, but are not limited to, charges for invalid or inappropriately sized Universal Pricing Codes ("UPCs"), defective Product returns charges, inappropriate or inadequate packaging or labeling, or charges for poor fill on orders of Product by such customers when corresponding unfilled orders from Company by Koch on such Product exist for a period in excess of thirty (30) days ("Non-compliance Fees"). In the event Koch is charged by its customers pursuant to a written communication from such customers, in connection with customer programs relating to the sales or stocking of Product generally, including but not limited to sales rebate programs, any such costs charged to Koch shall be charged back to Company by Koch ("Rebates"). Company shall be charged back any fees charged by accounts or third parties, transaction fees for vendor managed inventory to Koch for the purposes of merchandising the Product or so-called "slotting fees" (collectively "Merchandising Charges"). Advertising, Merchandising Charges and other charges as well as negative monthly payable balances due to negative sales and other amounts due Koch are due immediately and not subject to terms. Company is granting Koch a first priority security interest in all of its assets and is concurrently executing the Security Agreement as per Schedule C. Company will sign any pertinent UCC financing statements and any other documentation required to perfect Koch's security interest.

Notwithstanding the foregoing, for sales via DEMD, Koch shall apply to Company's account the Company Share percentage as per Schedule A of Koch's Net Receipts from sales via DEMD sixty (60) days after the end of the month in which they are received by Koch. "Net Receipts" means the amounts actually paid to Koch by Digital Service Providers for the Digital Distribution of the Products, less any (i) encoding, archiving and delivery costs, (ii) expenditures made by Koch on behalf of and approved by Company in connection with the promotion of the Products for sales via DEMD, (iii) any agent or sublicensee fees, and (iv) any fees approved by Company for Koch's marketing or other services in connection with sales via DEMD. Net Receipts shall not include any general advance unrelated to Company's particular Products which Koch may have received or may receive from any Digital Service Provider.

Koch is entitled to withhold a monthly returns reserve of thirty (30) percent of monthly gross Sales (before returns), subject to liquidation within nine (9) months. Notwithstanding the foregoing, Koch reserves the right to adjust the reserve for returns upward from time to time if Koch, in its good faith business judgment, believes that actual returns in a given reporting period will be significantly higher based on return authorization requests, soundscan data or otherwise.

Handling charges, including but not limited to returns penalties, disincentives, loose pick charges and small order charges which Koch is able to levy against its accounts are excluded from the above payables calculation and for Koch's sole benefit.

7

**NEW RELEASE SOLICITATIONS**. Koch may produce quantities of one sheets for its new release publications from electronically transmitted information provided by Company, and may charge Company's account at prices then in effect for such production. Alternatively, and at Koch's election, Koch may utilize Company-submitted information regarding a particular new release Product to prepare a pre-formatted listing of such new release in Koch's release publications, and may charge Company's account at prices then in effect for such publications. Koch may also offer Company a premium position in the new release publications. The decision to accept such position is at Company's sole discretion.

8

**MARKETING, PROMOTION**.   Koch is responsible for distribution only.   Company and Koch are jointly responsible for retail-marketing and Company will provide adequate advertising funds for retail campaigns.   For retail presentation and in-store promotion, Company provides promotional copies free of charge to Koch. Company does hereby agree that Koch Entertainment Distribution shall be credited as the distributor of Company's Product in all reports generated by Nielsen Soundscan and/or Videoscan. Company will furthermore provide merchandising materials such as catalogs, booklets, flyers and posters, as they may be available, free of

charge.  Company will undertake institutional advertising, marketing, promotion and publicity, at its sole discretion and expense.

Co-op advertising with Koch accounts is subject to Company's prior approval, and will be charged-back to Company by Koch.  Koch will use its best efforts to quote applicable account advertising rates, but cannot guarantee accuracy or account compliance.  Koch will, however, charge Company the actual rate charged to Koch by the account for any Company advertising.  Co-op advertising is debited to Company's account once the ad has been authorized and booked. Since Company is in possession of such authorization, Koch is not required to provide further documentation.  Company has full access to Koch's records and books, including advertising invoices and documentation and can obtain copies of such invoices and documentation during its audit of Koch.

9

**DISCLAIMERS.**  Except as expressly set forth in this Agreement, neither party makes, and each party hereby specifically disclaims, any representations or warranties, express or implied, regarding the distribution services provided by Koch or any third party supplier, including any implied warranty of merchantability or fitness for a particular purpose and implied warranties arising from course of dealing or course of performance.  Without limiting the generality of the foregoing, each party specifically disclaims any warranty regarding the profitability, success or value of any distribution services undertaken hereunder.

10

**SERVICE CHARGES.**  The following service charges are agreed and can only be revised subject to mutual agreement, except for annual inflation adjustment according to the CPI every January: drop shipping charge per unit of thirty cents ($0.30) (not inclusive of any freight charges) for any and all shipments or pickups of Company Product made at Company's request as per Company's instructions, returns processing charge of thirty cents ($0.30) per returned unit, a scrap fee of fifteen cents ($0.15) per destroyed unit and a slow moving product charge of $100 (One-Hundred Dollars) per month for each Product title' (selection number or SKU) with annual dollar Net Sales less than $2,000 (Two-Thousand Dollars), calculated based on the previous twelve (12) months' net sales on a rolling basis for each such SKU.  Returns shall be restored to inventory, unless they are shop-worn or defective.  Shop-worn Products are those Products, which by Koch's standards (generally applicable to Products of all of Koch's client labels) are deemed to be so damaged or excessively handled as to be unsaleable and not economically salvageable.  Defective Products are those Products which are properly designated by an account as defective or which by Koch's standards (generally applicable to Products of all of Koch's client labels) are deemed to be defective after visual inspection.  Koch is hereby authorized to scrap all shop-worn, inactive and defective Products as well as any Surplus Inventory returned to Koch at fifteen cents ($0.15) per item.  Company will receive a notarized certificate of such destruction. Company may, at its election, designate certain SKU's as "Destroy Upon Return".  In such instances, Koch will destroy the designated SKU's upon return to Koch until such time as Company informs Koch, in writing, of its desire to remove such designation. Any SKU's destroyed under such designation shall be subject to the scrap fee, but not the returns processing fee.

Company shall pay to Koch an annual administrative fee of three thousand dollars ($3,000.00) per Contract Year in consideration of the performance of administrative, accounting, on-line inventory access, retail sell through information and other services provided by Koch pursuant to this Agreement.  The administrative fee shall be debited to Company on the first day of each Contract Year during the Term.

11

**REPRESENTATIONS & WARRANTIES.**  Company hereby warrants and represents that it presently has and shall during the term of this Agreement continue to have full right, power and authority to have Koch distribute and sell its Products free and clear of any liens, encumbrances or claims, and to grant to Koch the right, free of any liens, encumbrances or claims, and subject to the terms of this Agreement, to use its trademarks and tradenames, artist names and likenesses, biographies, liner notes and artwork, artist performances and the like, as the case may be, on and in connection with the marketing and distribution of Company's Products. Trademarks and tradenames shall remain the exclusive property of Company.  Company also warrants and represents that all artist, mechanical and other (including patents) royalties, as well as synchronization fees and

master re-use fees, have been paid for in full. Company will account to the appropriate parties as regards mechanical royalties as may be required by U.S. law and report/pay quarterly to Harry Fox and the appropriate copyright owners. Company further agrees to indemnify and hold Koch harmless from and against any loss, cost, damage or expense (including court costs and reasonable attorneys' fees) which may be incurred by Koch as a result of any claim, action or proceeding brought against Koch which is inconsistent with the warranties and representations made herein. All warranties and representations under this paragraph 11 are subject to the security agreement, attached as Schedule "C" hereof.

12

**RECORDS ACCESS & AUDIT RIGHT**. Company has access to Koch's accounting records as they relate to Company at all times and may monitor daily activities via direct access to Koch's computer. Company reserves the right to audit Koch at any time during regular business hours once per year until one (1) year after termination.

13

**TERMINATION**. This Agreement may be terminated prior to the expiration of the term only upon the following material breaches, and only after notice of breach and failure to cure the breach within a thirty (30) day cure period:

a) By Company, if Koch fails to render its monthly statement or payment, refuses Company access to accounting records and inventory or if Koch ceases to function as a distributor.

b) By Koch, if Company is chronically out-of-stock on all or many parts of its inventory or if Company's net sales are negative during any two (2) month period or Company's returns ratio exceeds thirty-three (33) percent of the previous six months' gross sales or Company ceases to function as an entertainment media company.

Upon termination or expiration of this Agreement, Company must appoint a new bona fide distributor which distributor must assume distribution and full returns responsibility immediately upon commencement of its distribution for all Company Products, and furthermore provided that all Company Products must continue to bear the same barcode and Company Label and logo as during Koch's distribution tenure. Company will provide Koch with a returns assumption letter of Company's new distributor to that effect and Company represents that the new distributor will furnish such letter to all accounts. This letter will state that the new distributor unconditionally agrees to accept all Company Product returns from accounts immediately, including deleted titles which are still returnable as per Koch's deletion notice(s). For purposes of this Agreement, "bona fide distributor" is defined as any established (as opposed to "in formation" or "start-up") national music and/or video distributor which is recognized by all of Koch's top thirty accounts as a full-service distributor for Company Products and provided such distributor's returns assumption for Company Products is accepted by Koch's top thirty accounts and Koch is relieved from returns responsibility for Company Products. Both parties understand that despite such returns assumption of the new distributor, Koch may be forced to process returns "in transit" after termination that are in Koch's returns center or were sent to Koch due to prior authorization. Company assumes sole responsibility for returns "in transit" and any other returns Koch's processes, including but not limited to returns Koch will continue to receive from accounts that are not serviced by the new distributor. Company will hold Koch free and clear of all Company Product returns upon termination and will reimburse Koch in full (i.e. at full dealer credit before Koch's commission) for all returns Koch receives and processes after termination.

Company will remove its entire inventory from Koch's warehouse upon termination, including returns thereafter received by Koch. If all or any portion of such inventory is not removed by the sixtieth (60th) day from and after the expiration or termination date of this Agreement, Company irrevocably authorizes Koch to scrap such inventory, with the cost of scrapping to be borne by Company. Koch will inform Company in writing of Koch's intention to scrap such inventory five (5) days prior to taking such action. Notwithstanding, Koch is entitled to withhold Company's inventory and/or liquidate the inventory at discounted or cut-out prices, if a current balance is due Koch or if the balance due Company is insufficient to cover Koch's returns exposure.

Notwithstanding anything to the contrary set forth in this Agreement, Koch is entitled to withhold reasonable reserves against returns or other sums payable by Company to Koch upon notice of termination or non-renewal or expiration of this Agreement. It is agreed that Koch may retain the entire balance due Company upon notice of termination or non-renewal, if Company does not provide a full returns assumption from a bona-fide distributor.

Should the balance due Company not exceed fifty (50) percent of Gross Sales (gross sales before returns credits) for the preceding twelve (12) month period, Koch is also entitled to withhold Company's inventory as collateral and liquidate it. This reserve is to be applied to such returns and other payments due Koch for co-op advertising or other charges and the balance liquidated in two equal installments within nine (9) and eighteen (18) months from termination.

If, however, Company appoints a new bona fide distributor and provided such bona fide distributor furnishes a satisfactory returns assumption letter to Koch and Koch's accounts as per the above provisions, it is agreed that twenty (20) percent of Net Sales for the preceding twelve (12) month period are deemed a reasonable reserve whereby this reserve is to be applied to returns and other payments due Koch for co-op advertising or other charges and the balance liquidated in two equal installments within five (5) and ten (10) months from termination. In any case, Company will reimburse Koch immediately at any time during and after the Term of this Agreement, if a balance is due Koch from Company or once Koch's reserve is used up. If Company's remaining account balance with Koch upon termination does not exceed the required reserve balance as per this paragraph, Koch may require Company or Company's new distributor to post the balance as a bond, absent of which Koch is entitled to withhold Company's inventory, liquidate the inventory at discounted or cut-out prices and/or otherwise enforce the posting of such bond.

14

**ENTIRE DISTRIBUTION AGREEMENT.** This Agreement contains the entire agreement between the parties relating to the subject matter contained herein, and supersedes all prior agreements, written or oral, with respect thereto. This Agreement may be amended, superseded or cancelled and the terms hereof may be waived, only by a written instrument signed by officers of both parties, or, in the case of a waiver, by the party waiving compliance. This Agreement shall inure to and bind each of the parties hereto as well as their respective successors and assigns. Notwithstanding any of the foregoing, Koch shall not be deemed in breach of this Agreement unless such claim is reduced to a final judgment by a court of competent jurisdiction and Koch fails to pay Company the amount thereof within 30 days after Koch receives notice of the entry of such judgment.

15

**NOT PARTNERSHIP.** The relationship between Koch and the Company hereunder shall at all times be that of independent contractors; and nothing contained herein shall render or constitute the parties joint venturers, partners, agents or fiduciaries of each other. Neither Koch nor the Company shall hold itself out to third parties other than as set forth herein. Neither Koch nor Company shall have the right to execute any contract on behalf of the other, or incur any obligation for which the other may be liable, or otherwise bind the other; and, except as set forth herein, neither Koch nor Company shall be liable for any representation, warranty, covenant, agreement, act or omission of the other under this Agreement.

16

**CONFIDENTIALITY.** Company will not reveal its contractual terms with Koch to third parties during or after the term of this Agreement. Company furthermore understands that all memoranda, notes, records, reports, account lists, sales data, contracts and other documents generated by Koch and made available to Company concerning Koch's business shall be and remain Koch's property and shall be returned to Koch upon termination or earlier when requested by Koch. Company agrees to keep in confidence and not disclose to any third party any information concerning Koch's business, including but not limited to the foregoing items, which is not generally available to the public. Company acknowledges and agrees that a breach or threatened breach of the foregoing restrictions will cause irreparable injury and damage to Koch, by reason of which Koch shall be entitled to seek injunctive relief (without the necessity of posting a bond or other security) in addition to any other remedies available to Koch.

17

**REVISION & ENFORCIBILITY.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without

invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

18

**JURISDICTION.** This Agreement shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed entirely in such State. The parties agree to the exclusive jurisdiction of the Southern District Court of New York, New York.

Should either party initiate legal proceedings for the enforcement of this Agreement, the prevailing party shall additionally be entitled to recover all costs in maintaining or defending said legal proceeding, including but not limited to reasonable attorneys' fees.

**IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.**

International Media LLC ("Company")  FID# 36-4618367

By Gustavo Sagastume, President

KOCH Entertainment LP ("Koch")
By KOCH Entertainment GP LLC (Its General Partner)

By Michael E. Rosenberg, President

SOLELY TO THE EXTENT THE FOREGOING PERTAINS TO HIS INTEREST AS PROVIDED IN SECTION 1

Gustavo Sagastume

## SCHEDULE A

Titles:  Shangri-La DVD, Pope John Paul:  A Saint for our Times DVD, and such other titles as designated by Company from time to time.

Commencement of Term:  Upon initial release of Company Product.

Company Share:  Eighty (80) percent.

Koch Share:  Twenty (20) percent.

## SCHEDULE B

To Distribution and Consignment Agreement dated January 3, 2008 between **International Media LLC** and **Koch Entertainment LP**, Company hereby appoints **Entertainment One Limited Partnership dba Koch Entertainment** (hereafter "Koch Canada") as its exclusive national distributor for all of Company's audio and video Products for the territory of Canada (herein "Territory").

It is agreed and understood by all parties that the terms set out in the Distribution and Consignment Agreement referred to above will also govern this Schedule B which constitutes an agreement between Entertainment One Limited Partnership dba Koch Entertainment and Company with the following modifications and/or additions:

If and when applicable and provided Company is not receiving such fees directly from a collection society or association, Koch Canada further agrees to pay to Company a sum of money equal to eighty percent (80%) of all fees received by Koch Canada by way of levies or fees (including, for the avoidance of doubt, blank tape and compact disc levies) and for the public performance (including but not limited to broadcasts over radio or television) or records manufactured and sold hereunder. Whenever such fees are not computed and paid in direct relation to the public performance of such records such fees shall be computed for the purpose of this Agreement on a pro rata basis (i.e. by multiplying the total amount received by Koch Canada by a fraction, the numerator of which is the number of records manufactured and sold hereunder and the denominator of which is the total number of records sold in the Territory by or on behalf of Company).

### Clause 7

Should Company request Koch Canada to handle institutional advertising, marketing, publicity and promotion, and Koch Canada agrees to do so, then Koch Canada will deduct any and all such "out of pocket and/or third party expenses" it incurs, from any and all monies due to Company. Koch Canada will not charge Company for its staff time in handling promotion as set out above. Such provided services will include servicing of samples to appropriate radio stations and print media plus follow-up (usually referred to as tracking services). Koch Canada will also service music television with video clips as provided by Company. Koch Canada will endeavour to get Company's artists as many radio and press reviews plus interviews when they are in town or through telephone interviews as artist and media are available.

Furthermore, where required by law within the Territory, Company is solely responsible for all costs relating to video censor/ratings board charges as applicable, as well as the cost of mandatory stamps to be affixed to Video Products shipped to the Province of Quebec.

The following provisions shall apply solely to the sale of Products in Canada:

### Clause 11

Company also warrants and represents that all artist, synchronization, mechanical and other royalties (including patents) due for Product shipped to Canada have been paid for in full. Company further agrees to indemnify and hold Koch Canada harmless from and against any loss, cost, damage or expense (including court costs and reasonable attorney's fees) which may be incurred by Koch Canada as a result of any claim, action or proceeding brought against Koch Canada which is inconsistent with the warranties and representations made herein. However, if requested to do so by Company and Koch Canada agrees, then Koch Canada will apply for mechanical licences on Company's behalf and account mechanical royalties to the appropriate parties or their agents. Koch Canada will deduct such royalties due plus a 15% administration surcharge from any and all monies otherwise payable to Company. To facilitate Koch Canada's application for mechanical licences Company agrees, prior to or at the time of release of Product, to provide Koch Canada with label copy pertaining to each new release. Such label copy to include the title and timing of each track together with the composer, author and publisher information. If Company fails to provide said label copy in a timely fashion then the administration surcharge will increase to twenty-five percent (25%) to cover additional time needed to compile such information.

### Mass Placement

Notwithstanding anything to the contrary contained in this Agreement and provided Company agrees to have Product placed with a Mass Merchant then Company and Koch Canada agree to the following special terms

and conditions for the sale of Company's Products to Mass Merchants (Wal-Mart, Zellers or any new account that requires service organization).

(a) Company agrees that Koch Canada will charge to Company, a Placement and Servicing fee of One Dollar and Fifty Cents ($1.50) per unit shipped to the Mass Merchants, to cover placement, and mandatory servicing and stickering costs. Koch Canada will issue to Company, a monthly debit notice to cover the Mass Merchant Fee Charges. Company reserves the right to chose which, if any, of its Products will be paced at Mass Merchants.

(b) Co-op advertising, other advertising, and merchandising (including display stands and other point of sale materials) costs remain Company's sole responsibility; however, Koch agrees to obtain Company's prior written approval prior to implementing any such advertising or merchandising initiatives.

(c) For sales of Company Products to Wal-Mart, Koch Canada will pay Company according to the standard terms and conditions contained in this Agreement.

(d) As Koch Canada's relationship with Zellers is that of a consignment basis, Koch Canada will pay Company for sales of Company Product by Zellers, no later than thirty (30) days from Koch Canada's actual receipt of payment from Zellers, and based on the number of units reported as sold and paid for by Zellers. Koch Canada warrants that all such consignment Product shall remain the Property of Company until such time as such Product is reported as sold by Zellers and payment for such is received by or credited to Koch Canada.

(e) Should shrinkage exceed three (3) percent per any particular title as referred to in clause 4 of this Agreement, Company and Koch Canada agree to share equally the out of pocket manufacturing costs related to such excess shrinkage of Company Product at Zellers. Shrinkage is defined as total units shipped to Zellers, less total units returned by Zellers and total units paid for by Zellers.

**Canadian Dealer Cost Prices:**

**Audio:**   $13.95 (Price Code: LN) per full length Compact-Disc,
$8.17 (Price Code: GB) per full length Cassette,
$21.50 (Price Code: SG) for double CDs,
$7.50 (Price Code: FG) for mid-price Compact Disc,
$3.50 (Price Code: BG) for mid-priced Cassettes,
$5.50 (Price Code: DG) for Compact-Disc singles or budget CDs,
$2.50 (Price Code: AG) for Cassette Singles or budget MCs

**Video -** $5.50 (Price Code: E) for videos or DVDs carrying a suggested list price of $ 9.99;
$6.54 (Price Code: EP) for videos or DVDs carrying a suggested list price of $ 11.99;
$7.17 (Price Code FB) for videos or DVDs carrying a suggested list price of $12.99;
$8.25 (Price Code: GE) for videos or DVDs carrying a suggested list price of $14.99;
$11.00 (Price Code: J) for videos or DVDs carrying a suggested list price of $19.99;
$13.95 (Price Code: LN) for videos or DVDs carrying a suggested list price of $24.99
$16.50 (Price Code: OG) for videos or DVDs carrying a suggested list price of $29.99;
$19.50 (Price Code: RG) for multi-packs of videos or DVDs carrying a suggested list price of $34.99;
$22.00 (Price Code: T) for multi-packs of videos or DVDs carrying a suggested list price of $39.99;
$38.50 (Price Code: 2RE) for special video or DVD packages carrying a suggested list price of $69.99.

| | |
|---|---|
| **Company share:** | Seventy-five (75) percent. |
| **Koch Canada share:** | Twenty-five (25) percent |
| **Currency:** | Canadian Funds |

**SCHEDULE C**

<u>Security Agreement.</u>

(a)     As collateral security for Company's full and timely performance and observance of Company's obligations under this agreement, including but not limited to Company's payment over of royalties (including artist, mechanical and synchronization royalties) and securing sample and guest artist clearances, if any, Company hereby grant to Koch a first priority security interest in and to all of Company's right, title and interest in and to: (i) all existing and after-acquired inventory of the Product, and (ii) any proceeds from the sale or other disposition of the same, therefrom (collectively, the "Collateral").  Company hereby agrees to defend Koch's right, title, lien and security interest in and to the Collateral against the claims and demands of all persons whomsoever.

(b)     If any of Company's obligations are not timely fulfilled, Koch shall have the right, at any time and from time to time (i) to sell, resell, assign and deliver, in Koch's discretion, all or any of the Collateral, in one or more parcels at the same or different times, at public or private sale, for cash, upon credit or for future delivery, and (ii) to take any and all other actions permitted to be taken by a secured party under applicable law, including the Uniform Commercial Code.

(c)     The grant of the security interest in the Collateral shall be evidenced by UCC-1 Financing Statements (the "Financing Statements") in form and substance satisfactory to Koch to be executed by Company and delivered to Koch simultaneously with the delivery of the Product.  The security interest in the Collateral created hereby shall continue in full force and effect for the Term.  In the event Company fails to deliver the Financing Statement, Koch may perfect Koch's security interest by unilaterally filing the Financing Statement, and Company hereby grants Koch an irrevocable power of substitution coupled with an interest, as Company's attorney-in-fact and agent to file on Company's behalf the Financing Statement without Company's signature with respect to any and all of the Collateral.  Notwithstanding the foregoing, Koch agrees not to exercise such power of attorney unless Company does not execute and return to Koch such instrument, documents or other papers within ten (10) days after receipt thereof.  Company agrees that Company shall execute and acknowledge such other documents or instruments as Koch may deem reasonably necessary in order to perfect any and all elements of the security interest granted hereinabove including but not limited to the aforementioned Financing Statements.

(d)     Company specifically warrants and represents that Company owns all right, title and interest in and to the Collateral, free and clear of all mortgages, charges, liens, encumbrances or security interests.  Company will not hereafter suffer or permit any lien, charge, assignment, encumbrance or security interest of any kind with respect to the Collateral offered herein to be or become prior to superior to Koch's rights other than statutory laboratory liens which will be discharged in the normal course of business.

(e)     Company agrees that each and every term and agreement contained in any note executed and delivered by Company to Koch to evidence Koch's security interest in the Collateral shall be incorporated into and form a part hereof as if the same were set forth in full herein; all rights, remedies and powers granted to Koch herein or in any such note or other agreement given by Company to Koch shall be cumulative and may be exercised singly or concurrently; that the exercise of any right or remedy shall not preclude the exercise of any other right or remedy given herein or in any note or agreement given by Company to Koch; and that Koch shall have all the rights and remedies of a secured party under New York Uniform Commercial Code and other applicable law(s).

SCHEDULE D

## KOCH PRICING SCHEDULE

Current as of:  6/15/2007          Last Revised:  05/24/07

**CD/DVD-AUDIO/SACD/DUAL DISC**

| Sugg. List Price | Cost Price | Code |
|---|---|---|
| 2.98 | $1.75 | AA |
| 3.98 | $2.50 | AB |
| 4.98 | $3.00 | AC |
| 5.98 | $3.50 | AD |
| 6.98 | $4.50 | AE |
| 7.98 | $5.20 | AF |
| 8.98 | $5.84 | AG |
| 9.98 | $6.50 | AH |
| 10.98 | $6.97 | AJ |
| 11.98 | $7.90 | AK |
| 12.98 | $8.40 | AL |
| 13.98 | $9.15 | AM |
| 14.98 | $9.75 | AN |
| 15.98 | $10.37 | AP |
| 16.98 | $10.78 | AQ |
| 17.98 | $11.41 | AR |
| 18.98 | $12.02 | AS |
| 19.98 | $12.74 | AT |
| 20.98 | $13.40 | AU |
| 21.98 | $13.99 | AV |
| 22.98 | $14.81 | AW |
| 23.98 | $15.40 | AX |
| 24.98 | $16.25 | AY |
| 25.98 | $16.60 | DM |
| 26.98 | $17.50 | AZ |
| 27.98 | $18.28 | BA |
| 28.98 | $18.75 | BB |
| 29.98 | $19.40 | BC |
| 31.98 | $20.55 | BD |
| 32.98 | $21.20 | BE |
| 33.98 | $21.80 | BF |
| 34.98 | $22.50 | BG |
| 35.98 | $23.14 | BH |
| 36.98 | $24.00 | BJ |
| 38.98 | $25.18 | BK |
| 39.98 | $26.15 | BL |
| 42.98 | $27.95 | BM |
| 44.98 | $28.97 | BN |
| 46.98 | $29.95 | BP |
| 47.98 | $30.90 | BQ |
| 49.98 | $31.99 | BR |

**DVD-VIDEO/VHS**

| Sugg. List Price | Cost Price | Code |
|---|---|---|
| 5.98 | $3.29 | TA |
| 7.98 | $4.39 | VA |
| 8.98 | $4.94 | TB |
| 9.98 | $5.49 | VB |
| 11.96 | $6.59 | TC |
| 12.98 | $7.14 | VC |
| 13.98 | $7.69 | WC |
| 14.98 | $8.24 | VD |
| 15.98 | $8.79 | WD |
| 16.98 | $9.34 | WB |
| 17.98 | $9.89 | VE |
| 19.98 | $10.99 | VF |
| 21.98 | $12.09 | WL |
| 22.98 | $12.64 | WG |
| 24.98 | $13.74 | VG |
| 26.98 | $14.84 | VO |
| 27.98 | $15.39 | VI |
| 29.98 | $16.49 | VH |
| 34.98 | $19.24 | VJ |
| 39.98 | $21.99 | VK |
| 44.98 | $24.74 | WE |
| 49.98 | $27.49 | VL |
| 54.98 | $30.24 | WJ |
| 59.98 | $32.99 | WF |
| 69.98 | $38.49 | VM |
| 74.98 | $41.24 | WH |
| 79.98 | $43.99 | WA |
| 89.98 | $49.49 | VN |
| 99.98 | $54.99 | VP |
| 109.98 | $60.49 | VQ |
| 119.98 | $65.99 | VX |
| 129.98 | $71.49 | VW |
| 149.98 | $82.49 | WI |
| 89.82 | $49.41 | P2 |
| 134.82 | $74.16 | P3 |
| 169.98 | $93.49 | WK |
| 269.98 | $148.23 | VR |
| 349.98 | $192.78 | VS |
| 389.98 | $215.64 | VT |

**CASSETTE/LP***

**Music Video price codes**

| Sugg. List Price | Cost Price | Code |
|---|---|---|
| $2.99 | $1.85 | MA |
| $4.99 | $3.09 | MB |
| $5.99 | $3.71 | MC |
| $7.99 | $4.95 | MD |
| $8.99 | $5.57 | ME |
| $9.99 | $6.19 | MF |
| $10.99 | $6.81 | MG |
| $11.99 | $7.43 | MH |
| $12.99 | $8.05 | MI |
| $13.99 | $8.67 | MJ |
| $14.99 | $9.29 | MK |
| $15.99 | $9.91 | ML |
| $16.99 | $10.53 | MM |
| $17.99 | $11.15 | MN |
| $18.99 | $11.77 | MO |
| $19.99 | $12.39 | MP |
| $20.99 | $13.01 | MQ |
| $21.99 | $13.63 | MR |
| $22.99 | $14.25 | MS |
| $23.99 | $14.87 | NI |
| $24.99 | $15.49 | MT |
| $25.99 | $16.11 | MU |
| $26.99 | $16.73 | MV |
| $27.99 | $17.35 | MW |
| $29.99 | $18.59 | MX |
| $32.99 | $20.45 | MY |
| $34.99 | $21.69 | MZ |
| $35.99 | $22.31 | NK |
| $36.99 | $22.93 | NA |
| $39.99 | $24.79 | NB |
| $42.99 | $26.65 | NC |
| $44.99 | $27.89 | ND |
| $49.99 | $30.99 | NE |
| $59.99 | $37.19 | NG |
| $69.99 | $43.39 | NF |
| $89.99 | $55.79 | NH |
| $99.99 | $61.99 | NJ |
| $199.99 | $123.99 | NL |

**SINGLES/CD-5/12" VINYL***

| Sugg. List Price | Cost Price | Code |
|---|---|---|

| List Price | Cost Price | Code |
|---|---|---|
| 50.98 | $32.94 | BS |
| 52.98 | $34.49 | BT |
| 54.98 | $35.41 | BU |
| 55.98 | $36.08 | BV |
| 59.98 | $38.60 | BW |
| 61.98 | $39.95 | BX |
| 63.98 | $41.20 | BY |
| 64.98 | $42.24 | BZ |
| 69.98 | $45.70 | DB |
| 74.98 | $48.28 | DC |
| 79.98 | $51.50 | DD |
| 84.98 | $54.80 | DE |
| 89.98 | $58.50 | DF |
| 99.98 | $64.20 | DG |
| 105.98 | $68.50 | DH |
| 114.98 | $79.00 | DU |
| 119.98 | $82.50 | DJ |
| 139.98 | $95.85 | DT |
| 149.98 | $102.70 | DS |
| 169.98 | $116.50 | DN |
| 179.98 | $114.10 | DP |
| 189.98 | $120.00 | DU |
| 194.98 | $133.50 | DK |
| 209.98 | $135.80 | DY |
| 239.98 | $150.05 | DZ |
| 289.98 | $179.00 | EA |
| 316.98 | $190.00 | EB |
| 358.98 | $205.20 | EC |
| 499.98 | $325.00 | DL |
| 638.98 | $415.00 | ED |
| 716.98 | $446.00 | EF |

| Sugg. List Price | Cost Price | Code |
|---|---|---|
| 3.49 | $2.10 | FE |
| 3.98 | $2.35 | CA |
| 4.98 | $2.90 | CB |
| 5.98 | $3.50 | CC |
| 6.98 | $4.05 | CD |
| 7.98 | $4.72 | CE |
| 8.98 | $5.25 | CF |
| 9.98 | $5.84 | CG |
| 10.98 | $6.43 | CI |
| 11.98 | $7.00 | CJ |
| 12.98 | $7.50 | CL |
| 13.98 | $8.10 | CM |
| 14.98 | $8.70 | CN |
| 15.98 | $9.30 | CP |
| 16.98 | $10.60 | CQ |
| 17.98 | $10.75 | CH |
| 19.98 | $11.65 | CR |
| 20.98 | $12.05 | CW |
| 21.98 | $13.30 | CX |
| 22.98 | $13.70 | CS |
| 24.98 | $14.90 | CT |
| 25.98 | $15.65 | FA |
| 29.98 | $17.70 | CU |
| 31.98 | $19.25 | FB |
| 35.98 | $21.65 | FC |
| 39.98 | $23.60 | CV |
| 44.98 | $27.30 | FF |
| 47.98 | $27.90 | CZ |
| 49.98 | $29.45 | CY |
| 54.98 | $32.89 | CK |
| 89.98 | $52.25 | FD |

| List Price | Cost Price | Code |
|---|---|---|
| 1.98 | $1.15 | RI |
| 2.49 | $1.45 | RJ |
| 2.98 | $1.75 | RK |
| 3.49 | $1.85 | RA |
| 3.98 | $2.55 | RB |
| 4.49 | $2.40 | RC |
| 4.98 | $2.95 | RD |
| 5.98 | $3.43 | RE |
| 6.49 | $3.80 | RF |
| 7.49 | $4.40 | RG |
| 7.98 | $4.69 | RH |

**MERCHANDISE & AUDIO BOOKS**

| Sugg. List Price | Cost Price | Code |
|---|---|---|
| 4.98 | $2.74 | SC |
| 13.98 | $7.89 | WC |
| 17.98 | $8.99 | XB |
| 19.98 | $12.74 | AT |
| 22.98 | $11.49 | XC |
| 29.98 | $14.99 | LA |

SCHEDULE E

## MANUFACTURING SCHEDULE

**For all Manufacturing:**
- Freight: ex plant / printer; $0.10 per unit including Print from plant to KOCH warehouse
- Special Packaging: All other packaging subject to acceptance by KOCH and separate quote
- All preparation and film charges shall be charged back to Company at twenty-five percent (25%) over invoice.
- All DVD mastering and authoring is subject to acceptance by Koch and a separate quote.
- All other formats not specified herein (i.e Vinyl, SACD, UMD, HDDVD, Blu-Ray) shall be subject to acceptance by Koch and a separate quote.
- For all Print: Specifications/Stock:
  Folder: 100# gloss text coated 2 sides up to 12 pages, 80# gloss text coated 2 sides for 12 pages to 24 pages; Inlay: 100# gloss text coated 2 sides; Folder: 4 ¾ x 4 23/32 Inlay: 5 13/32 x 4 5/8; Folder: 4 over 1 4/C process (one side) 1/C (black for back side); Folder: 4 over 4 4/C process two sides; Inlay: 4/C process one side

## COMPACT DISC MANUFACTURING

- **CD Manufacturing:** $0.75 per Unit, including CD replication, Jewel-Box, assembly, Top Spine, 3 color CD-Label, Shrink-Wrapping, ex-plant; additional CD-Label colors $0.05 per additional color

- **CD Print (prices per thousand):**

**Booklets or Folders *Note:** Prices for FOLDERS above 6 pages or BOOKLETS above 16 pages are subject to a separate quote.

| 4/1 Quantity | 2PP Folder | 4PP Folder | 6PP Folder | 8PP Booklet | 12PP Booklet | 16PP Booklet |
|---|---|---|---|---|---|---|
| 1000 | $ 217.00 | $ 325.00 | $ 439.00 | $ 688.00 | $ 735.00 | $ 825.00 |
| 2500 | $ 120.00 | $ 163.00 | $ 244.00 | $ 348.00 | $ 373.00 | $ 453.00 |
| 5000 | $ 87.00 | $ 110.00 | $ 184.00 | $ 196.00 | $ 236.00 | $ 273.00 |
| 10000 | $ 57.00 | $ 85.00 | $ 138.00 | $ 152.00 | $ 196.00 | $ 196.00 |
| 25000 | $ 52.00 | $ 81.00 | $ 131.00 | $ 143.00 | $ 179.00 | $ 182.00 |
| 50000 | $ 53.00 | $ 78.00 | $ 122.00 | $ 134.00 | $ 179.00 | $ 173.00 |
| 75000 | $ 51.00 | $ 78.00 | $ 121.00 | $ 125.00 | $ 172.00 | $ 184.00 |
| 100000 | $ 51.00 | $ 71.00 | $ 119.00 | $ 123.00 | $ 170.00 | $ 181.00 |

| 4/4 Quantity | 2PP Folder | 4PP Folder | 6PP Folder | 8PP Booklet | 12PP Booklet | 16PP Booklet |
|---|---|---|---|---|---|---|
| 1000 | $ 450.00 | $ 475.00 | $ 575.00 | $ 1,188.00 | $ 1,438.00 | $ 1,463.00 |
| 2500 | $ 240.00 | $ 267.50 | $ 320.00 | $ 647.00 | $ 735.00 | $ 815.00 |
| 5000 | $ 145.00 | $ 182.50 | $ 225.00 | $ 457.00 | $ 735.00 | $ 524.00 |
| 10000 | $ 95.00 | $ 130.00 | $ 177.50 | $ 314.00 | $ 512.00 | $ 370.00 |
| 25000 | $ 82.50 | $ 102.50 | $ 152.50 | $ 282.00 | $ 335.00 | $ 307.00 |
| 50000 | $ 70.00 | $ 97.50 | $ 147.50 | $ 270.00 | $ 311.00 | $ 286.00 |
| 75000 | $ 62.50 | $ 95.00 | $ 145.00 | $ 260.00 | $ 294.00 | $ 284.00 |
| 100000 | $ 62.50 | $ 87.50 | $ 137.50 | $ 246.00 | $ 284.00 | $ 274.00 |

**CD Inlays**

| Colors | 1000 | 2500 | 5000 | 10000 | 25000 | 50000 | 75000 | 100000 |
|---|---|---|---|---|---|---|---|---|
| 4/0 | $180 | $163 | $105 | $ 86 | $ 53 | $ 49 | $ 49 | $ 47 |
| 4/1 | $195 | $173 | $120 | $ 95 | $ 56 | $ 53 | $ 53 | $ 53 |
| 4/4 | $275 | $216 | $130 | $105 | $ 63 | $ 60 | $ 56 | $ 56 |

## *DVD MANUFACTURING*

- **DVD Manufacturing**: Single sided DVD5 = $1.00 per Unit, DVD9 = $1.25 per Unit.  Price includes replication, case, assembly, edge label, 2 color DVD-Label, Shrink-Wrapping, Sensormatic Tags (1 out of every 3)

- **DVD Print (prices per thousand):**

Booklets or Folders *Note: Prices for FOLDERS above 6 pages or BOOKLETS above 32 pages are subject to a separate quote.

| 4/1 | 1000 | 2500 | 5000 | 7500 | 10000 | 25000 | 50000 | 75000 | 100000 |
|---|---|---|---|---|---|---|---|---|---|
| 2PP FOLDER | $ 338 | $ 143 | $ 84 | $ 68 | $ 66 | $ 50 | $ 43 | $ 41 | $ 36 |
| 4PP FOLDER | $ 483 | $ 222 | $ 132 | $ 116 | $ 87 | $ 73 | $ 66 | $ 66 | $ 63 |
| 6PP FOLDER | $ 763 | $ 331 | $ 202 | $ 175 | $ 143 | $ 108 | $ 101 | $ 96 | $ 96 |
| 8PP BOOKLET | $ 843 | $ 389 | $ 244 | $ 222 | $ 197 | $ 140 | $ 124 | $ 115 | $ 112 |
| 12PP BOOKLET | $ 973 | $ 468 | $ 315 | $ 268 | $ 231 | $ 192 | $ 170 | $ 158 | $ 153 |
| 16PP BOOKLET | $1,105 | $ 542 | $ 372 | $ 325 | $ 291 | $ 236 | $ 209 | $ 195 | $ 190 |
| 20PP BOOKLET | $1,255 | $ 616 | $ 411 | $ 357 | $ 318 | $ 266 | $ 236 | $ 224 | $ 217 |
| 24PP BOOKLET | $1,378 | $ 690 | $ 485 | $ 424 | $ 377 | $ 310 | $ 278 | $ 266 | $ 256 |
| 28PP BOOKLET | $1,510 | $ 761 | $ 539 | $ 475 | $ 426 | $ 350 | $ 315 | $ 296 | $ 288 |
| 32PP BOOKLET | $1,835 | $ 916 | $ 640 | $ 554 | $ 490 | $ 406 | $ 367 | $ 345 | $ 335 |

| 4/4 | 1000 | 2500 | 5000 | 7500 | 10000 | 25000 | 50000 | 75000 | 100000 |
|---|---|---|---|---|---|---|---|---|---|
| 2PP FOLDER | $ 450 | $ 198 | $ 123 | $ 103 | $ 95 | $ 67 | $ 55 | $ 53 | $ 48 |
| 4PP FOLDER | $ 685 | $ 320 | $ 208 | $ 158 | $ 130 | $ 113 | $ 100 | $ 88 | $ 71 |
| 6PP FOLDER | $ 988 | $ 463 | $ 288 | $ 233 | $ 206 | $ 127 | $ 115 | $ 114 | $ 109 |
| 8PP BOOKLET | $1,170 | $ 554 | $ 353 | $ 301 | $ 265 | $ 193 | $ 166 | $ 150 | $ 143 |
| 12PP BOOKLET | $1,585 | $ 745 | $ 478 | $ 404 | $ 348 | $ 253 | $ 216 | $ 198 | $ 189 |
| 16PP BOOKLET | $2,000 | $ 943 | $ 605 | $ 527 | $ 466 | $ 329 | $ 276 | $ 253 | $ 242 |
| 20PP BOOKLET | $2,435 | $1,137 | $ 701 | $ 598 | $ 522 | $ 375 | $ 320 | $ 297 | $ 281 |
| 24PP BOOKLET | $2,833 | $1,333 | $ 860 | $ 745 | $ 657 | $ 485 | $ 414 | $ 382 | $ 365 |
| 28PP BOOKLET | $3,238 | $1,526 | $ 982 | $ 860 | $ 769 | $ 561 | $ 478 | $ 434 | $ 417 |
| 32PP BOOKLET | $4,228 | $1,955 | $1,230 | $1,039 | $ 894 | $ 654 | $ 556 | $ 502 | $ 480 |

**Outer Wraps:**

| Colors | 1000 | 2500 | 5000 | 7500 | 10000 | 25000 | 50000 | 75000 | 100000 |
|---|---|---|---|---|---|---|---|---|---|
| 4/0 | $495 | $217 | $143 | $126 | $113 | $ 86 | $ 81 | $ 74 | $ 71 |
| 4/1 | $533 | $257 | $175 | $155 | $138 | $111 | $ 99 | $ 94 | $ 91 |
| 4/4 | $670 | $317 | $224 | $195 | $172 | $123 | $108 | $103 | $ 99 |

## DIGIPAK MANUFACTURING (CD and DVD)

The Following Schedule is for Digipak manufacturing and insertion charges.  These charges are not inclusive of the cost of the actual disc, which are as follows:

Audio CD - $.60  DVD5 - $.90   DVD9 - $1.25

Insertion Charge – $.10 per disc.

Standard Digipak Charges, 4 Color with shrinkwrap, black or white tray.  Prices are per 1000.

|  | 4 panel | 6 panel | 8 panel |
|---|---|---|---|
| 2500 | $ 1,000 | $ 1,400 | $ 1,600 |
| 5000 | $ 700 | $ 1,000 | $ 1,200 |
| 10000 | $ 600 | $ 750 | $ 900 |
| 15000 | $ 500 | $ 700 | $ 800 |
| 20000 | $ 475 | $ 600 | $ 775 |
| 35000 | $ 450 | $ 575 | $ 750 |
| 50000 | $ 425 | $ 550 | $ 725 |
| 100000 | $ 400 | $ 525 | $ 700 |

Standard Upcharges.  Prices are per 1000.

|  | Standard Pocket | Diagonal Pocket | Clear Tray | Second Tray | Tipped in Book | 1/C Backside | 4/C Backside | UV, Gloss, Matte Coating |
|---|---|---|---|---|---|---|---|---|
| 2500 | $ 300 | $ 130 | $ 40 | $ 240 | $ 150 | $ 240 | $ 350 | $ 200 |
| 5000 | $ 250 | $ 120 | $ 40 | $ 240 | $ 130 | $ 140 | $ 250 | $ 160 |
| 10000 | $ 150 | $ 100 | $ 40 | $ 220 | $ 120 | $ 80 | $ 200 | $ 120 |
| 15000 | $ 150 | $ 90 | $ 40 | $ 220 | $ 100 | $ 70 | $ 180 | $ 100 |
| 20000 | $ 150 | $ 80 | $ 40 | $ 220 | $ 100 | $ 70 | $ 160 | $ 100 |
| 35000 | $ 150 | $ 70 | $ 40 | $ 200 | $ 100 | $ 60 | $ 150 | $ 80 |
| 50000 | $ 140 | $ 60 | $ 40 | $ 200 | $ 100 | $ 40 | $ 140 | $ 80 |
| 100000 | $ 120 | $ 40 | $ 40 | $ 200 | $ 100 | $ 20 | $ 120 | $ 40 |